UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NUMBER: 3:02CR341 (EBB) |
| | : | |
| v. | : | |
| | : | |
| ANGEL HERNANDEZ, DAVID BROWN, | : | |
| RICHARD BROWN and NELSON DATIL, | : | |
| | : | |
| Defendants. | : | December 15, 2005 |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS
FOR JUDGMENTS OF ACQUITTAL AND NEW TRIAL**

Defendants Angel Hernandez ("Hernandez"), David Brown, Richard Brown, and Nelson

Datil ("Datil") have moved the Court under Fed. R. Crim. P. 29 to set aside the jury's guilty

verdicts as to all counts of the Fourth Superseding Indictment of which they were convicted.  In

the alternative, the defendants have moved the Court to grant a new trial under Fed. R. Crim. P.

33.[1]

---

[1]    The defendants moved orally for judgments of acquittal at the conclusion of the
Government's case-in-chief.  The Court reserved ruling on the motions, and after the guilty
verdicts were announced, directed the defendants to file memoranda supporting their oral Rule
29 motions at a later date.  On September 29, 2005, Richard Brown filed his Motion for
Judgment of Acquittal or New Trial and to Adopt Relevant Arguments of Co-defendants (Doc.
#573).  On November 2, 2005, David Brown filed his Memorandum in Support of Motion for
Judgment of Acquittal and for a New Trial (Doc. #589).  On November 8, 2005, out of time and
without seeking leave to file out of time, Nelson Datil filed his Memorandum in Support of
Motion for Judgment of Acquittal and for New Trial (Doc. #591).  On November 15, 2005, out
of time but requesting leave to file out of time, Angel Hernandez filed his Memorandum in
Support of Motion for Judgment of Acquittal or, in the Alternative, for a New Trial (Doc. #594).
The Government objects to Datil's and Hernandez's untimely filings under Rules 29 and 33.
Under both rules, any motion for relief (except for a new trial based on newly discovered
evidence) must be filed within 7 days after the verdict or finding of guilty, or within such further

(continued...)

Count 1 of the Fourth Superseding Indictment charged all defendants with conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 371.  Counts 2 through 22 charged Hernandez and in some instances the other above-named defendants with substantive counts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively.[2]  Because the evidence adduced at trial supports the jury's verdicts, the defendants' motions for judgment of acquittal should be denied.  In addition, because the defendants have not identified any error warranting a new trial, their motions brought under Rule 33 should be denied as well.

## I.    <u>Motions for Judgment of Acquittal</u>

A "defendant shoulders a heavy burden in challenging the sufficiency of evidence supporting a conviction." <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and citation omitted).  In deciding a motion for judgment of acquittal, the Court views the evidence presented in the light most favorable to the Government, and draws all reasonable inferences in the Government's favor.  <u>Id.</u>  The evidence must be considered in its totality, not in isolation, and the Government need not negate every theory of innocence.  <u>Id.</u>  The

---

[1](...continued)
time as the court sets during the 7-day period.  Here, on the day the jury rendered its verdicts, the Court gave the defendants three weeks to file all post-trial motions.  With the Government's consent, Hernandez subsequently moved for an additional 30 days to file his post-trial motions, and the Court granted that motion.  However, Hernandez made his post-trial filings approximately two weeks after that additional 30-day period had expired.  To the Government's knowledge, Datil never moved for additional time to file his post-trial motions, and made his filings approximately five weeks late.  The Government submits that Hernandez and Datil have waived their opportunity to seek relief under Rules 29 and 33.  <u>See</u> <u>Carlisle v. United States</u>, 517 U.S. 416, 434-36 (1996) (Rule 29); <u>United States v. Canova</u>, 412 F.3d 331, 344-47 (2d Cir. 2005) (Rule 33) (dicta).

[2]    The jury convicted Hernandez, David Brown, and Datil of all counts in which they were charged.  The jury convicted Richard Brown of Counts 1, 17, and 18.  The jury acquitted Richard Brown of Counts 8, 11, and 12.

Court must be careful to avoid "usurping the role of the jury," id. (quoting United States v.
Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)), and accordingly may not substitute its own
determinations of credibility or relative weight of the evidence for that of the jury. Autuori, 212
F.3d at 114. The Court "must determine whether upon the evidence, giving full play to the right
of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a
reasonable mind might fairly conclude guilt beyond a reasonable doubt." Id. (quoting United
States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)). If the Court concludes that either a verdict
of guilty or not guilty was possible based on the evidence, it must uphold the jury's guilty
verdict. See Autuori, 212 F.3d at 114. Put another way, the Court may "not disturb a conviction
on grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt." United States v. Pimentel,
346 F.3d 285, 295 (2d Cir. 2003) (internal quotation marks and citations omitted). This
deference to the jury is especially important in conspiracy cases, as "a conspiracy by its very
nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid
bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170,
180 (2d Cir. 2003) (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.1992)).

A.    The Government Met Its Burden of Proof on All Counts of Conviction

The Government introduced substantial evidence which proved the elements of each
offense charged beyond a reasonable doubt. With respect to Count 1, the Government proved
that: (1) two or more persons entered the unlawful agreement charged in the indictment; (2) each
defendant knowingly and willfully became a member of the conspiracy; (3) one of the members
of the conspiracy knowingly committed at least one of the overt acts charged in Count 1 of the

indictment; and (4) the overt act was committed to further some objective of the conspiracy.

With respect to Counts 2 through 22, the Government proved that: (1) there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises, as alleged in the indictment; (2) the defendants convicted of each count knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud, or knowingly and intentionally aided and abetted others in the scheme; and (3) in executing the scheme, the defendants used or caused the use of the mails, a private or commercial interstate carrier, or interstate wires as specified in the indictment.

     1.    Conspiracy Count - Count 1

        a.    Existence of an Unlawful Agreement

It is beyond dispute that a conspiracy existed at Shoreline Mitsubishi to commit mail fraud and wire fraud. Five former employees of the dealership (Bruce Vetre, Jose Espinosa, Louis Pierro, James Clanton, and Jose Concepcion), having previously pleaded guilty to conspiracy charges, testified about the workings of the conspiracy. The plan was to defraud both Mitsubishi Motors Credit of America, Inc. ("Mitsubishi Credit") and Shoreline Mitsubishi's customers. As the former employees testified, the policy of the dealership under Hernandez's leadership was to falsify credit applications to make customers appear more creditworthy than they actually were, prior to those credit applications being wired and/or mailed to Mitsubishi Credit in California. In addition, the Government presented evidence concerning more than 25 specific car purchases where false information about customers' income, rent or other material information was provided to Mitsubishi Credit. The customers (primary applicants and/or co-

signers) explained to the jury that they had provided truthful information about their incomes, rents, occupations, etc. to their salespersons, and the jury then saw the false information about those items that was submitted to Mitsubishi Credit by wire and/or mail.  (See, e.g., testimony of Wesley Witcher, Shirley Witcher, Andrea Williams, Bienvenido Montalvo, Rosa Santana, Ana Burgos, and Royce Sullivan, among many others.)  The original handwritten drafts of credit applications typically were destroyed so that there would be no record of the information the customers had actually provided to the dealership.  After receiving false information about Shoreline Mitsubishi customers, Mitsubishi Credit extended credit to many of those customers.

With respect to that portion of the scheme which targeted the customers as victims, the lies and misrepresentations began with the dealership's advertising, when potential customers were told in commercials about a deferred payment program, that is, that they could make no payments for a certain amount of time.  However, that program was not available with the balloon financing to which Shoreline Mitsubishi steered customers 95 to 98 percent of the time. (See Tr. Vetre, Aug. 12, 2005, at 16.)  In addition, the commercials guaranteed approval for financing or the dealership would give them $100.  However, if an approval was not obtained, in order to avoid paying the promised $100, the dealership would tell declined applicants that they had been "approved" for a payment of $50 or $75 per month, which was not enough to buy an actual car.  (Tr. Concepcion, Aug. 24, 2005, at 8.)

Once customers actually came into the dealership, their salespersons and the managers with whom they dealt made numerous material misrepresentations and omissions to them.  Many customers testified at trial that neither their salesperson nor anyone else they met at Shoreline Mitsubishi told them about their final balloon payments.  Other customers testified that they were

not told about extended service contracts and insurance policies being added to their transactions. In addition, the dealership in many instances charged customers for CD changers and other optional items when no such equipment had been added to the car.  In other instances, when CD changers or other optional items were actually installed, dealership employees told the customers that they were being included free of charge, when in fact the transaction paperwork reflects that they were charged for those items.  Furthermore, Hernandez, Vetre, David Brown, and others frequently pocketed cash down payments that the customers provided for their purchases. Whether or not the cash down payment was stolen, the cash amount provided by customers as down payments often was added to the price of the cars instead of lessening the amount the customers would need to finance.

In addition, there was evidence that many cars left Shoreline Mitsubishi without the Monroney stickers being provided to customers.  Several customers testified that they never saw and/or received the Monroney stickers that should have been on or in their new cars when they left the dealership.  Vetre confirmed that "a fair number of cars ... did not have the window sticker on the car.  It was very well-known that if a customer questioned it, the answer was, well, tell them we took it off in cleanup and it got destroyed."  (Tr. Vetre, Aug. 11, 2005, at 32.)  In fact, however, there was a large pile of window stickers in the offsite building used to clean the cars prior to delivery to customers.  (Tr. Espinosa, Aug. 17, 2005, at 57-58.)

In sum, there was overwhelming evidence presented at trial that a conspiracy existed at Shoreline Mitsubishi to defraud both Mitsubishi Credit and Shoreline Mitsubishi's customers.

b.    Participation of the Trial Defendants in the Conspiracy

The evidence also established that Hernandez, David Brown, Richard Brown, and Datil

each knowingly and willfully became a member of the above-described conspiracy.

i.    <u>Angel Hernandez</u>

As General Manager of Shoreline Mitsubishi, Hernandez ran the sales and financing operations of the dealership, and made it very clear that "nobody was going to touch it." (Tr. Vetre, Aug. 11, 2005, at 19.) The fraud at the dealership emanated from Hernandez. Vetre, Pierro, and Concepcion testified that Hernandez instructed them to inflate customers' incomes on credit applications. At a Saturday morning sales meeting in approximately the spring or the early summer of 2002, Hernandez explained to the sales staff that Mitsubishi Credit required customers to have a minimum of $1600 in monthly income, and indicated that it was the managers' job to bump up the customers' incomes on the credit applications. (Tr. Vetre, Aug. 11, 2005, at 35-36; Tr. Vetre, Aug. 12, 2005, at 167.) The other cooperating witnesses also recalled one or more sales meetings at which Hernandez spoke openly about inflating customer incomes on credit applications.

Hernandez also came up with the idea to list fake rental income as "other" income on credit applications. To that end, Hernandez gave Vetre blank rental agreements to use to submit to Mitsubishi Credit if necessary. (Tr. Vetre, Aug. 11, 2005, at 39-41.) Hernandez personally "purged" the deal files of any original handwritten credit applications. He told Vetre that he did not want anything accidentally being sent to the bank (Mitsubishi Credit) that the bank was not supposed to see. (Tr. Vetre, Aug. 12, 2005, at 58.)

In addition, it was Hernandez's idea to charge customers for non-existent optional items such as CD changers. (Tr. Vetre, Aug. 11, 2005, at 8-9.) Hernandez also came up with the

-7-

policy – contrary to federal law[3] –  to remove Monroney stickers from the cars so that customers

would not have them.  (Tr. Vetre, Aug. 11, 2005, at 32.)  This was done to facilitate the

dealership's routine practice of charging customers several thousand dollars above the cars'

sticker prices.  Hernandez also told Vetre that, if a customer happened to notice that he or she

had been charged well over the sticker price, Vetre should lie and say that the price was higher

because the dealership had "bought down" the interest rate.  (See Tr. Vetre, Aug. 12, 2005, at

38.)  Hernandez also concocted the scheme to steal the customer down payments, sharing the

cash on occasion with Vetre, Pierro, David Brown, and others.  (See Tr. Vetre, Aug. 11, 2005, at

21-24; Tr. Vetre, Aug. 12, 2005, at 72.)

                    ii.    Salespersons

        With respect to salespersons David Brown, Richard Brown, and Datil, the evidence at

trial showed they each joined the conspiracy with knowledge of its purpose(s).  At Shoreline

Mitsubishi, salespersons were supposed to get the information from the customers that was

required for the credit applications.  Numerous customers testified at trial that they truthfully told

their salespersons, including David Brown, Richard Brown, and Datil, their salary, rent, and

other information.  In some instances, customers truthfully told their salespersons that they or

their cosigners did not have current jobs.  (See, e.g., testimony of Shirley Witcher, Pamela

Bozzuto, Marie (Bozzuto) Aurigemma, Bienvenido Montalvo, Carmen Montalvo, Royce

Sullivan, Danielle Fowler, Ana Burgos, and Israel South.)  The jury could infer that the

salespersons either included false jobs for those customers on the credit applications and/or knew

that a manager would do so.  In other instances, the customers reported income to the

_____

[3]        See 15 U.S.C. § 1233(c).

salespersons that was low enough that the jury could infer the salespersons knew that the only way the customer would be approved for a new car was that the customers' income was going to be misrepresented to Mitsubishi Credit in a rewritten or Daybreaked credit application.

It certainly was not a secret at the dealership that incomes were being inflated on credit applications. (Tr. Vetre, Aug. 11, 2005, at 43.) As noted above, Hernandez openly discussed this policy at a Saturday morning sales meeting that was attended by David Brown, Richard Brown, and Datil. (Tr. Concepcion, Aug. 24, 2005, at 90-91.) All of the cooperating witnesses recalled such a meeting or meetings where Hernandez spoke openly about inflating customer incomes on credit applications. In addition, Clanton, Espinosa, and Concepcion all testified that the Daybreaking of false information was done openly, and was plainly visible to salespersons, who congregated at the sales desk, waiting for their credit applications to be transmitted to Mitsubishi Credit.

It was also clear to the salespersons that Shoreline Mitsubishi was drawing its clientele from a subprime consumer base. It purposely advertised to people with bad credit, claiming that they could get people approved whom other dealerships had not been able to qualify. The dealership provided a shuttle bus to bring people without cars from inner city communities to Shoreline Mitsubishi. They also encouraged customers to come to the dealership in taxicabs, telling them they could leave with new cars.

The compensation of salespersons at Shoreline Mitsubishi was structured so that, in order for the salespersons to earn large commissions, the cash selling price of the car had to be substantially over sticker price. The balloon program was attractive to the dealership because it allowed it to charge the much higher price, but to keep the customer's monthly payment lower

than it would be under a conventional program where every payment, including the last payment, was equal.  The problem from the dealership's perspective was that, if the customers were told they would be responsible for paying a much larger last payment, or alternatively (depending on the date of the transaction) possibly turning in the car and being without transportation after having made all the other monthly payments, many of the customers would not have gone through with the transactions.  Several customers testified that David Brown, Richard Brown, and Datil told them about the monthly payment, but not the balloon payment.  The jury could properly infer that the salespersons' failure to disclose the last balloon payment was a purposeful, material omission, designed to trick the customers into going forward with the deals so that the salespersons would earn their commissions.[4]

In addition to these facts that shed light on the knowledge and intent of all three salespersons, there was substantial evidence introduced at trial relating to the salespersons' defendants individually:

**David Brown** - Vetre testified about a particular instance when David Brown left the

---

[4]    The salespersons were the first employees to discuss the payment terms with the customers, and it was the salespersons' job to get the customers to sign a handwritten retail purchase order to signify their agreement to go forward with the purchase.  (See Tr. Vetre, Aug. 12, 2005, at 44; see e.g., Govt Ex. 05-07.)  Usually, someone in the finance office "delivered" the cars to the customers, that is, had them sign the rest of the paperwork, including the typed retail purchase order, the retail installment contract, and the Daybreaked version of the credit application, among other items.  However, at times the dealership was too busy for Vetre or another Finance employee to "deliver" cars to the customers.  In those cases, the salesperson who had sold the car to the customer often would be tasked to deliver the car to the customer.  According to Vetre, several salespersons occasionally delivered cars to customers, including David Brown, Richard Brown, Espinosa, Danny Perez, and Richard Dominguez.  (Tr. Vetre, Aug. 11, 2005, at 16, 17-18.)  Several customers testified at trial that it was their salespersons who had them go through all the paperwork at the end, and that they therefore spoke only with their salespersons about their payment terms.

income field in a credit application blank. Vetre asked David Brown what he wanted him to do with the application, and Brown told him to make the income "match" the monthly payment so that Mitsubishi Credit would fund the deal. (Tr. Vetre, Aug. 12, 2005, at 40.) Vetre testified that Brown – as well as other salespersons – quite often left blank the income field in the credit applications. The purpose of doing this was to let Vetre put in the necessary amount of income – regardless of the veracity of that amount – to get the deal to go through. (Tr. Vetre, Aug. 12, 2005, at 56-57.) Concepcion also testified that several salespersons gave him credit applications with the income field left blank so that he could decide what income needed to be filled in to get an approval. Concepcion stated that David Brown gave him at least one blank credit application. (Tr. Concepcion, Aug. 24, 2005, at 23-25.[5])

Vetre also testified about Andrea Williams' purchase of a Mitsubishi Lancer in September 2001. David Brown was the salesperson on that transaction. According to Vetre, he, Hernandez, and David Brown knew that Mitsubishi had a stipulation requiring that one of Ms. Williams' open loans be paid off, and that Shoreline Mitsubishi's plan was to not actually pay off Ms. Williams' Nissan Maxima loan. (Tr. Vetre, Aug. 12, 2005, at 45-46.) Hence, Vetre arranged for postal money orders to be purchased and photocopied. The photocopies were filled in to make it appear as if Ms. Williams had paid off her Maxima loan to Crescent Bank and Trust. This was completely false.[6] David Brown received a commission on this transaction after

---

[5]    Concepcion testified that Richard Brown and Nelson Datil also gave him at least one credit application with the income field left blank. (Tr. Concepcion, Aug. 24, 2005, at 25.)

[6]    In addition, Ms. Williams' income was falsely stated to be $39,000 per year on the credit applications submitted both for the purchase of her Lancer and for the purchase by her companion, Willard Hyman, of a Mitsubishi Montero for which Ms. Williams was the co-signer.

(continued...)

Mitsubishi Credit extended financing to Ms. Williams based on false information.

Vetre and Concepcion testified about the Pamela and Marie Bozzuto transaction, which was another David Brown deal. Vetre testified that Brown came into his office, apparently having just been in Hernandez's office. Brown told Vetre that Hernandez wanted to use Vetre's fishing rod business as the employment for one of the customers in the Bozzuto deal. (Tr. Vetre, Aug. 12, 2005, at 65.) The co-signer on that deal, Marie Bozzuto, was unemployed at the time, and of course had nothing whatsoever to do with Vetre's fishing rod company, VRC Crafting. Vetre told David Brown he did not care what they did, but they should leave him out of it. (Tr. Vetre, Aug. 12, 2005, at 65.) Concepcion testified that David Brown came to him on that deal and said that Vetre wanted him to Daybreak the deal listing Vetre's business as the employment for one of the applicants. Concepcion refused to do it, telling Brown that if Vetre wanted his business to be used for that purpose, he could Daybreak the deal himself. (Tr. Concepcion, Aug. 24, 2005, at 30-31.) Vetre then sent the Bozzutos' credit application to Mitsubishi via Daybreak. The application falsely stated that Marie Bozzuto was working for VRC Crafting. David Brown was sitting by Vetre as he Daybreaked the Bozzuto transaction. (Tr. Vetre, Aug. 12, 2005, at 118.)

Shirley Witcher and Wesley Witcher both testified that, at the time they bought a car at Shoreline Mitsubishi, Shirley was not employed at Pratt and Whitney, and that she had never earned $41,000 per year at that company. However, the credit application submitted to Mitsubishi Credit, which the jury reasonably could have concluded was handwritten by David

---

[6](...continued)
(See Govt Exs. 04-01 & 05-01.)

Brown,[7] falsely stated that Shirley Witcher was currently earning $41,000 at Pratt and Whitney. The Witchers testified that they told David Brown the truth about Shirley's lack of employment and income. Based on this evidence, the jury reasonably could have concluded that David Brown knowingly and willfully participated in the fraud on Mitsubishi Credit in connection with the Witcher transaction.

**Richard Brown** - The handwritten credit application mailed to Mitsubishi Credit for Danielle Fowler's purchase of a Mitsubishi Galant (Govt Ex. 18-01) stated that Fowler's co-signer, Ana Burgos, worked at Hartford Hospital as a certified nurse's aide. This was false. As Ms. Burgos testified, she had been unemployed for many years, during which time she knew Richard Brown personally because he was a friend of her son. After reviewing other documents known to have been completed by Richard Brown, and comparing the handwriting on those documents to the handwriting on the Fowler/Burgos credit application (particularly the distinctive letter "H"), the jury could properly conclude that Richard Brown had completed the false credit application with knowledge that Burgos was not employed at Hartford Hospital.

Regarding the Rosa Santana/Maria Agosto transaction, as discussed in more detail below, see page 29 infra, the jury properly concluded that Richard Brown was aware of, aided and abetted, and benefitted from the false information provided to Mitsubishi Credit about a purported pension for Ms. Agosto.

Bruce Biron testified that he gave Richard Brown a $250 cash down payment and that

---

[7] Among other similarities, the letter "L" on the credit application bore a striking resemblance to "L's" that were included on other documents that were known to have been written by David Brown.

Brown put Biron's cash in his pocket.[8]  That cash down payment did not appear on Biron's transaction paperwork.  The jury could have concluded that Richard Brown stole that cash down payment from Biron.  There were also false statements submitted to Mitsubishi Credit on Biron's credit application.

**Nelson Datil** - Former Branford Detective Kevin Potter testified about incriminating statements Datil made to him during a voluntary interview in October 2002.  Datil told Potter that he knew incomes were being changed on his deals in order to get people qualified for financing.  He also admitted that he had known Royce Sullivan did not have a job at the time the paperwork went to Mitsubishi Credit on that transaction.  He also told Potter that he knew the numbers on the Melissa Bailey/Maria Ramos transaction had been changed.  The jury could properly conclude from Datil's own statements to Potter that he was a knowing and willful participant in the conspiracy.

In addition, the jury heard from Melissa Bailey, who described how Datil came to Hartford and had her grandmother, Maria Ramos, sign the transaction documents as a co-signer.  Datil did not disclose the balloon payment to Bailey or Ramos.  In addition, the jury saw the handwritten credit application for that transaction, which claimed that Ramos received $3000 per month in social security income.  A witness from the Social Security Administration testified about the actual amount of Ramos's social security income; it was nowhere near $3000 per month.  Bailey testified that the handwriting on the credit application was not hers.  The jury was also shown other documents known to be written by Datil, and comparing the way the number "3" was written on those documents to the 3's on the Bailey/Ramos credit application, the jury

---

[8]        As Attorney Hillis described it, Biron's cash down payment "went south."

could reasonably infer that Datil wrote that false credit application himself.

Royce Sullivan's testimony corroborated Datil's admission to Potter that, prior to the time the transaction paperwork was sent to Mitsubishi Credit, Datil knew that Sullivan had been laid off his job at Empower New Haven Inc. Yet that deal got funded based on false information, and Sullivan defaulted on the loan almost immediately.

Bienvenido and Carmen Montalvo both testified that Carmen Montalvo had been disabled and had not worked for several years leading up to the time they purchased a car at Shoreline Mitsubishi. Consistent with Shoreline's practice,[9] Datil asked them where Carmen had worked previously, and they told him, Futuramic. The jury saw the Montalvos' Daybreaked credit application, which stated that Carmen was currently working at "Duturamic." The jury could reasonably infer that Datil asked the Montalvos about Carmen's previous employment not out of idle curiosity, but rather to include it on the credit application he handed into the sales desk for Daybreaking. In addition, when Datil showed the Montalvos their car, there was no Monroney sticker on it, and they never received the Monroney sticker for their car. Also, Datil did not tell the Montalvos about an extended service contract or a non-existent CD changer for which they were charged.

---

[9]     As noted above, this was one of several instances the jury heard about in which salespersons confronted with unemployed applicants asked them or their co-applicants where they had worked previously. Louis Pierro testified about another transaction in which Danny Perez had a female customer who no longer had a job. Pierro asked Hernandez how they should handle the situation. Hernandez told Pierro to tell Perez to find out where the customer had previously worked and to use that employment on the credit application. (Tr. Pierro, Aug. 19, 2005, at 100-01.) (See also Tr. Clanton, Aug. 22, 2005, at 38-39 ("Basically, they would put the job that they used to be at. Q: Why would you put the job that they used to be at? A: That's the most recent job that shows up on the credit application. Q: You mean the credit bureau report? A:. Yeah, the credit bureau.")).

Datil also failed to disclose material terms of car purchases to Lisa Eng and Mary Jane Best. Datil did not mention the final balloon payment to either one, failed to disclose an extended service contract to Eng, and lied to Best about her being required to buy optional insurance. There were false statements on their credit applications as well, despite the fact that they had provided truthful information to Datil. The jury could properly conclude that the evidence relating to these transactions also indicated that Datil was a knowing and willful member of the conspiracy at Shoreline Mitsubishi to defraud Mitsubishi Credit and Shoreline Mitsubishi's customers.

c.    <u>Overt Acts</u>

Through presenting the testimony of the cooperating witnesses and customers, some of which has been discussed above, and by introducing the relevant documentary exhibits, the Government proved several overt acts alleged in Count 1 of the Indictment, including the acts charged in paragraphs 33 (Jeffrey Lucas false credit application), 34 (Pamela Bozzuto false credit application), 35 (Royce Sullivan false credit application), 36 (Rosa Santana false credit application), 37 (Andrea Williams false credit application), 38 (false information about Andrea Williams' Crescent Bank and Trust car loan), and 40 (sale of car to Bienvenido Montalvo without Monroney label, including charge of $650 for non-existent CD changer). The jury properly concluded that one or more of these overt acts were committed to further an objective of the conspiracy, that is, to commit wire fraud or mail fraud and thereby obtain money from Mitsubishi Credit and Shoreline Mitsubishi's customers.

2.    <u>Fraud Counts - Counts 2 Through 22</u>

With respect to Counts 2 through 22, the Government introduced a plethora of evidence –

-16-

some of which is discussed elsewhere in this response – which established each of the elements of the offense as to each convicted defendant.

As discussed in detail above in connection with the conspiracy count, it is beyond dispute that there was a scheme or artifice to defraud Mitsubishi Credit by materially false and fraudulent pretenses, representations or promises. More than 50 witnesses and hundreds of documentary exhibits established the existence of the scheme to defraud. The evidence also showed beyond a reasonable doubt that, with respect to each count for which there was a conviction, the convicted defendant knowingly and willfully participated in the scheme to defraud. The documents relevant to each count were admitted into evidence. False statements on the credit applications at issue in each substantive count were proved by the customers' testimony in conjunction with the documentary evidence. The "01-A" exhibits (Mitsubishi transaction records) demonstrated that Mitsubishi Credit received the false information and used it in determining whether to extend credit to the customers at issue. Based on the defendants' positions in the dealership, their involvement with the transactions at issue in Counts 2 through 22, and all the evidence the jury heard about how the scheme worked, the jury properly inferred knowing and willful participation in the charged conduct by each defendant they convicted. Finally, it is undisputed that the mails and wires were used to further the scheme as charged in Count 2 through 22.

B.    The Defendants' Arguments for a Judgment of Acquittal Lack Merit

Nothing in the defendants' memoranda supporting their motions for judgment of acquittal establishes that the jury reached the incorrect conclusion with respect to any of the counts of conviction.

1.     None of the Arguments Advanced By Angel Hernandez
       Compels the Court to Overturn the Jury's Verdict

Hernandez argues that, as a matter of law, the elements necessary to sustain a conviction for conspiracy and for the substantive counts of mail fraud and wire fraud were not satisfied. As discussed above, the Government clearly established all of the elements of conspiracy and all of the elements of the substantive counts beyond a reasonable doubt. Accordingly, Hernandez's Rule 29 motion should be denied.

a.     The Fraud As Charged In The Conspiracy Was Proven

Hernandez argues that the Government failed to prove fraud against the customers of Shoreline or against Mitsubishi Credit. As the Court is well aware, Count 1 of the indictment charged all the defendants with conspiracy to commit mail fraud and wire fraud. As charged in the indictment and as proven at trial beyond a reasonable doubt, the defendants committed fraud against both Mitsubishi Credit and against the Shoreline customers. The Government's burden would have been satisfied had the Government proven intended or contemplated harm as to either the customers or Mitsubishi Credit. However, the Government more than met its burden and proved that the defendants defrauded both the customers and Mitsubishi Credit.

Additionally, while the Government needed only to establish that the defendants contemplated some actual harm or injury to the victims, see United States v. Frank, 156 F.3d 332, 335 (2d Cir. 1998); United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994), the Government again more than satisfied its burden by proving actual harm to both the Shoreline customers and Mitsubishi Credit.

-18-

      b.      The Government Established Fraud Against The Shoreline
               Customers

Hernandez argues that the jury's verdict should be set aside because the evidence did not

establish any false representations made to the customers.  This is simply not the case.  The

evidence introduced at trial in the form of customer testimony and supporting documentary

evidence clearly established that false representations were made to the customers.  As discussed

above, customer after customer came before the jury and testified that they were misled about

material terms of their car purchase, including the defendants fraudulently failing to inform them

about a final balloon payment, fraudulently charging them for insurance contracts and service

contracts they did not request and did not want, preparing and submitting fraudulent paperwork

that reflected the installation of CD changers and other optional items, when no such items were

installed, and charging for them.  The evidence even established that the defendants pocketed the

customer down payments.

Hernandez argues, without citing any legal authority, that because the customers signed

and initialed paperwork that referenced some of the terms and charges such as final balloon

payments, service contracts, and insurance policies, that the customers were – necessarily – not

defrauded.  This argument fails.

As an initial matter, the paperwork that the customers were asked to sign was not

explained to them and did not reflect all the material charges.  For instance, the paperwork did

not reflect the fact that the price they were being charged was increased to reflect the cost of a

CD changer.  As documents and testimony established, a false repair order was placed in the file,

the price charged was increased to include the price of the CD changer, and the amount financed

-19-

by Mitsubishi Credit was increased by the requisite amount.  The customers had no way of

knowing from the paperwork they received that the final price of the car and the amount of the

loan was determined based on the inclusion of a CD changer.[10]  This defrauded the customers

because they were paying for a CD changer that they never received, and defrauded Mitsubishi

Credit because it was advancing funds for an item never installed.

Additionally, there was evidence presented that in certain deals the paperwork – that

Hernandez argues cures any misrepresentations – itself falsely stated a material term of the

agreement.  For instance, Jose Santiago testified that he made a down payment of $3,000, and the

contract that was provided to him by salesperson Michael Rivera reflected his down payment of

$3,000 (Govt Ex. 27-11).  However, the actual paperwork sent to Mitsubishi Credit reflected a

down payment of only $2,000 (Govt Ex. 27-06).  Clearly, the paperwork did not accurately set

forth all the material terms.  Additionally, as Mr. Santiago testified, one of the versions of the

purchase orders (Govt Ex. 27-08) was not even signed by him.  As Vetre testified, at times

customer signatures were forged on documents.  (Tr. Vetre, Aug. 12, 2005, at 73-74.)  In

addition, as Pierro testified, handwritten terms were sometimes added to retail purchase orders

after the customers had already signed them. (Tr. Pierro, Aug. 19, 2005, at 113.)  Obviously if a

customer is not provided with the actual paperwork, or if terms are added to the paperwork after

the customer signs it, it cannot seriously be argued that the paperwork can explain away the false

verbal statements.

Hernandez goes on to argue that the signatures and initials of the customers provided at

_____

[10]     The customers were not given copies of the repair orders that were sent to
Mitsubishi Credit purportedly to document the installation of a CD changer, spoiler, or other
optional item.

the time of the transaction "served to acknowledge that they had read and fully understood all the terms of the deal." (Hernandez Mem at 5.) This obviously is not the case. Several customers testified that they did not read the documents and did not understand the terms. This was made very clear by the customers' direct testimony and reiterated time and again on cross-examination, as defense counsel laboriously sought to establish that the customers had not read the contracts and did not understand them. A number of customers even acknowledged on cross-examination that they could not read English or read well at all. In many instances, the customers testified that they were rushed through the documents, as the defendants or their coconspirators urged them quickly to "sign here, sign here."

After establishing at trial that some customers did not read or understand the detailed contracts – in some instances because they were rushed through them by dealership personnel – Hernandez now seeks to argue that the customers are deemed to have read the contracts and that the words on the printed page cure all the verbal misrepresentations and half-truths. This argument has no merit. It is well settled that "[t]he fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose. . . . [U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." Autuori, 212 F.3d at 118 (citing United States v. Altman, 48 F.3d 96, 102 (2d Cir. 1995)); United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982). "A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading. Autuori, 212 F.3d at 118 (citing Remington Rand Corp. v. Amsterdam - Rotterdam Bank, N.V., 68 F.3d 1478, 1484

(2d Cir. 1995)). The jury certainly could conclude that, because the salespersons as well as the managers did not disclose their knowledge of the balloon payments, service contracts, CD changers and other charges that were included in the deals, their statements of the monthly payment alone were misleading by their incompleteness.

### c.    The Government Established Fraud Against Mitsubishi Credit

As discussed above, the evidence introduced at trial also established that the defendants engaged in a scheme to defraud Mitsubishi Credit by sending materially false and misleading information on credit applications via interstate wires and the mails to Mitsubishi Credit. After receiving the false information contained on the credit applications, Mitsubishi Credit extended credit to Shoreline customers and accordingly put its funds at risk. As a result, the defendants enriched themselves by obtaining commissions and salaries and Mitsubishi Credit suffered actual financial harm.

The scheme to defraud Mitsubishi Credit was established through the testimony of cooperating witnesses who were by their own admission coconspirators, through the testimony of Shoreline customers and their corresponding credit applications, and through the testimony of Mitsubishi Credit representatives.

Regarding the testimony of Mitsubishi Credit representatives, Steven Van Overen in particular testified that the information on credit applications, such as income, employment, monthly rent payments, and even time at residence or length of time employed, was material to Mitsubishi Credit's funding decision. This testimony was not rebutted.

Hernandez argues that the Government failed to meet its burden because it did not establish "the exact way in which the allegedly false information impacted on the loan decision"

(Hernandez Mem. at 7), or how the false information "affected any particular decision by Mitsubishi Credit to extend credit." (Id.) This argument is without merit. First, the Government recalls that, at one point in a hearing outside the presence of the jury, counsel for Hernandez conceded that Van Overen's testimony established the materiality of the false statements for purposes of submitting the case to the jury. Moreover, it is clear from Mitsubishi Credit's records and Van Overen's testimony that Mitsubishi Credit indeed did rely on the information that Shoreline Mitsubishi sent to it by way of the credit applications, and that it was material. In each transaction for which evidence was presented, the false information was sent to Mitsubishi Credit for the specific purpose of affecting the lending decision. Further, the fact that the false information appeared in Mitsubishi Credit's records, coupled with the fact that Van Overen testified that Mitsubishi Credit deemed that information important in the lending decision, was more than sufficient for the jury to conclude that the false statements at issue here were material.

Hernandez next argues that there was no showing that Mitsubishi Credit extended credit to the specific customers "in reliance upon specific (or even general) incorrect information." (Hernandez Mem. at 8.) This argument also has no merit. Based on Van Overen's testimony and the loan records introduced, the jury clearly could have concluded that Mitsubishi Credit relied on the false information.[11] Furthermore, the Government need not show actual reliance to sustain a conviction for mail fraud and wire fraud. The Supreme Court has held that, whereas materiality

---

[11]    It bears mention that in Count 2, the social security number for "Julio" Davila was included on the credit application of Jeffrey Lucas (see Govt Exs. 02-01 & 02-01A) along with a false name, false salary, false rental income and a phony signature. In short, all of the information about "Julio" Davila was fraudulent. Since all of the information about the non-existent Mr. Davila - the person on whom the FICO approval depended - was fraudulent, obviously Mitsubishi Credit relied on false information in approving that deal.

of false statements is an element of mail and wire fraud, actual reliance and damages suffered are not elements of those offenses. <u>Neder v. United States</u>, 527 U.S. 1, 25 (1999) (holding that "by prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted") (citing <u>United States v. Stewart</u>, 872 F.2d 957, 960 (10th Cir. 1989) ("[Under the mail fraud statute,] the government does not have to prove actual reliance upon the defendant's misrepresentations")).

Because Hernandez has failed to meet his "heavy burden" to demonstrate that the jury's verdicts as to him were incorrect, the Court should deny his Rule 29 motion.

> 2.   None of the Arguments Advanced By David Brown
>        Compels the Court to Overturn the Jury's Verdict

In his memorandum, David Brown takes issue with the jury's guilty verdicts on all counts in which he was charged. His arguments miss the mark.

First, David Brown argues that the jury's verdict on Count 3 should be set aside because of a lack of credibility of the witnesses and because of an insufficiency of evidence tying him to the act of wiring the false information to Mitsubishi Credit on the Witcher transaction. He asserts that the testimony of Wesley Witcher and Shirley Witcher was "patently incredible" (D. Brown Mem. at 5), and that Shirley Witcher's credibility was "almost non-existent." (<u>Id.</u>) Brown points out a few insignificant and irrelevant inconsistencies and in essence invites the Court to "intrude upon the jury function of credibility assessment." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992). The Court should decline that invitation.

As a legal matter, "Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences

to be drawn for that of the jury.' . . . In fact, if the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" United States v. Guadagna, 183 F. 3d 122, 129 (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)).

In any event, the testimony of both Wesley and Shirley Witcher was entirely credible. They were consistent as to all the relevant information. Both testified that Shirley was a co-signer on the purchase. Both testified that Shirley used to work at Pratt and Whitney, but was hurt in 1977 and had not worked there since. Both testified that the information on the credit application about Shirley's employment and income was false, and that they were not responsible for that false information being on the application. Many other customers gave similar accounts concerning their experiences at Shoreline Mitsubishi, corroborating the Witchers' assertions. Clearly, the jury found the Witchers' testimony to be credible, and they properly convicted David Brown (and Angel Hernandez) on Count 3.

Brown next argues that there is insufficient evidence to tie him to the fraudulent transactions charged in Count 4 (the Willard Hyman/Andrea Williams purchase) and Count 5 (the Andrea Williams purchase). To the contrary, there was more than sufficient evidence to link David Brown to these transactions. Brown was the salesperson on both deals, and according to Shoreline Mitsubishi's salesperson pay plan, received substantial commissions on the deals. He met with Ms. Williams and knew that she was not earning anything close to $39,000. Moreover, as discussed above, Vetre testified that David Brown was aware of the plan to mislead Mitsubishi Credit into believing that Ms. Williams had paid off her other car loan.

As to Counts 10 (Gwendolyn Morgan/Lisa Browdy transaction) and 21 (DiMauros

transaction), Brown argues that there is not sufficient evidence to link him to the fraudulent

credit applications sent to Mitsubishi Credit on those deals.  This argument is also meritless.

First, David Brown was the salesperson on these deals, and played an integral role in them.  He

met with the customers, spoke with them about their incomes, and eventually received a

commission on the deals.  As to Count 21, Ms. DiMauro testified that she did not give her

personal information to her grandson.  The jury thus could infer that she gave that information

directly to David Brown, whom she knew personally from working with him at A-1 Toyota.

Similarly, regarding Count 10, Ms. Browdy spoke to Brown over the phone and told him her

salary as a bus driver.  The information that appeared on the Daybreaked credit applications for

the Morgan/Browdy and DiMauro deals was false.  The fact that Brown may  not have personally

operated the Daybreak machine when the false information was transmitted to Mitsubishi Credit

on those deals is of no moment.  It is well settled that under the Pinkerton doctrine, "a defendant

who does not directly commit a substantive offense may nevertheless be liable if the commission

of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to

the defendant as a consequence of their criminal agreement."  Cephas v. Nash, 328 F.3d 98, 101

n.3 (2d Cir. 2003). Thus, a defendant may be found "guilty on a substantive count without

specific evidence that he committed the act charged if it is clear that the offense had been

committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the

defendant was a member of that conspiracy."  United States v. Miley, 513 F.2d 1191, 1208 (2d

Cir. 1975).

Regarding Count 15, as discussed above, there was direct evidence from Vetre and

Concepcion that David Brown aided and abetted the fraudulent use of Vetre's fishing rod

company as Marie Bozzuto's employer.  Additionally, Vetre testified that David Brown was sitting right next to him when he Daybreaked the Bozzuto deal.  The argument that David Brown was "merely relaying a message from Angel Hernandez" to Vetre when he told him that Hernandez wanted Vetre to use his company as the employer for Marie Bozzuto and was not "advocating" or "condoning the activities," (D. Brown Mem. at 13), is absurd.

Finally as to the conspiracy count, David Brown attacks the credibility of Vetre and Jose Espinosa.  As discussed above, determining credibility is the province of the jury.  See Guadagna, 183 F.3d at 129.  Moreover, there is evidence that David Brown was at the Saturday sales meetings at which income inflation was openly discussed.  The Court should not disturb the jury's findings in this regard.

3.    None of the Arguments Advanced By Richard Brown
Compels the Court to Overturn the Jury's Verdict

Richard Brown's arguments boil down to a contention that there was not a sufficient nexus between his role at the dealership and the fraudulent conduct that occurred at the dealership, and that there was insufficient evidence to show that he had knowledge of or the intent to further that fraudulent conduct.  He argues that it would be pure speculation to convict him on the evidence presented. (R. Brown Mem. at 21.)  These arguments are devoid of merit, and Richard Brown's Rule 29 motion accordingly should be denied in its entirety.

Richard Brown argues that the jury's verdict on the three counts of which he was convicted should be set aside because of an insufficiency of evidence tying him to the fraud, specifically a lack of evidence of his knowledge, intent or contemplation of fraud.  This general critique of the evidence, is insufficient to carry the defendant's heavy burden under Rule 29,

especially when the volume of evidence is considered in a light most favorable to the Government.

Brown summarizes a portion of the evidence, attempting to focus the Court on what the witnesses did not say "specifically" (e.g., "Espinosa did not testify as to specific instances of fraudulent acts of specific managers and specific salesmen").  However, while a number of the witnesses provided testimony that did specifically reference Richard Brown by name and what they directly observed (i.e., direct evidence), other witnesses, including the former Shoreline employees, provided very strong circumstantial evidence, which can be equally weighty in supporting a conviction.  For instance, Espinosa testified that the salespersons would bump the income to get a customer approved.[12]  He also testified that salespersons would receive commissions on such deals,[13] and that the falsification of customer credit information was done out in the open.[14]   Similarly Vetre, Espinosa, Concepcion, Pierro, and Clanton each testified about the fraud being discussed at the Saturday sales meetings.  Several of the former employees testified that all the salespersons were required to be at those meetings.  Viewing this evidence in the light most favorable to the Government, the jury clearly could conclude – contrary to his

---

[12]    See Tr. Espinosa, Aug. 16, 2005, at 25-26 ("We'd go up to the Daybreak machine, show them the application.  The customer, to qualify for the loan, they had to make over 1,500 a month gross income.  So, the higher the income you put there, the higher the approval you was going to get, depending on their credit history.  If they had a good credit, most likely you would bump the income.  They would never ask you for proof of income because the credit would justify the proof of income. . . .)

[13]    See Tr. Espinosa, Aug. 16, 2005, at 25-26 ("Q:  And when this happened on a deal would you get a commission?   A: Yes.")

[14]    See Tr. Espinosa, Aug. 16, 2005, at 26 ("Q  And you said you saw it.  Was this done openly?  A:  It was kind of done openly because you had a desk right in front of you there.")

argument – that Richard Brown was aware of and participated in the fraud.

Brown points out that, while Rosa Santana testified that she was not told her CD changer was going to be an extra charge, she did not specifically say that Richard Brown did not tell her that; rather, she used the pronoun, "they," meaning representatives of the dealership.  However, the jury could infer from Santana's testimony that "they" included her salesperson, Richard Brown.  Accordingly, it is logical for the jury to have included Richard Brown as one of the Shoreline representatives who made a material omission with respect to Ms. Santana's purchase. Moreover, because Richard Brown discussed certain terms of the transaction with Santana but failed to disclose other terms, these half-truths, in light of the circumstances under which they were made, were misleading.  See Autuori, 212 F.3d at 118.

Brown also argues that a nexus between him and the false statements on the credit application, namely that Ms. Agosto received a pension, was not established.  This argument also lacks merit.  There are numerous connections between Brown and the credit application, including: the fact of the approval going through, his being told what car (or size loan) the customer could be approved for, and ultimately the receipt of the commission.  Keeping in mind the fact that Santana and Agosto told Brown that Agosto only received Social Security income, and the fact that the transmission to Mitsubishi of such truthful information would have posed a problem to the deal's approval, the jury certainly could conclude that Brown was aware that the income amounts would need to be inflated, and that he aided and abetted that fraudulent transaction and benefitted financially from it through a commission.

Finally, Richard Brown argues that there is no nexus between himself and the final documentation of the Fowler/Burgos transaction (Count 18).  This argument has no merit.  As

-29-

discussed above, the evidence conclusively established that Richard Brown knew Danielle

Fowler personally, and had known Ana Burgos since 1973, having grown up a neighborhood

friend of Ms. Burgos' son. Brown knew that Burgos did not have a job. Nevertheless, the credit

application – written in Brown's own hand – listed Burgos as working at Hartford Hospital as a

certified nurse's aide, earning $1,900 a month. This figure just happened to be the amount

necessary to meet the FICO program's payment-to-income ratio at the necessary payment. (See

Govt Ex. 18-05.) Considering all the evidence on this transaction, the jury properly concluded

that Richard Brown was not only aware of the fraudulent nature of the Fowler/Burgos transaction

but was an active participant.[15]

  As explained above, none of the arguments advanced by Richard Brown is sufficient to

carry his heavy burden and cause this Court to enter a judgment of acquittal on his counts of

conviction.

---

[15]   In the last sentence of his memorandum, Richard Brown makes a fleeting claim that the Court should acquit him of the three counts on which he was convicted "because the quality and quantity of proof matches those Counts upon which the jury found him not guilty." (R. Brown Mem. at 25.) To the extent Brown is seeking to overturn the jury's guilty verdict based on the fact that the jury acquitted him of other counts, the Supreme Court has made clear that a defendant may not attack the sufficiency of the evidence on the basis of an inconsistent verdict. See United States v. Powell, 469 U.S. 57 (1984); Dunn v. United States, 284 U.S. 390 (1932); see also United States v. Gaind, 31 F.3d 73, 79 (2d Cir. 1994) (inconsistent verdicts provide no grounds for reversal as a matter of law); United States v. Palmieri, 456 F.2d 9, 12 (2d Cir. 1972). Here, the three substantive counts on which Richard Brown was acquitted involved unique transactions and unique customers. It is impossible to know exactly why the jury acquitted Brown on these counts and convicted him of the other three counts in which he was charged. One thing is clear: this jury asked for most if not all of the transcripts at issue in Richard Brown's charges. They appear to have given careful consideration to the testimony against him and the other defendants on trial. The Court should respect the jury's verdicts of guilty on Counts 1, 17, and 18 as to Richard Brown.

4.      None of the Arguments Advanced By Nelson Datil
Compels the Court to Overturn the Jury's Verdict

Datil argues in support of his motion for judgment of acquittal pursuant to Rule 29 that his knowledge of the fraud was not established.  In essence, he merely reiterates the closing argument that the jury rejected.  Because this Court cannot substitute its judgment for the jury's when making credibility determinations – and because the evidence plainly supported the jury's findings of guilt – Datil's Rule 29 motion should be denied.

Datil first argues that he did not profit from the fraud.  This obviously is not the case.  During his 11-month tenure at Shoreline, Datil earned approximately $70,000.  Moreover, Datil was paid on each and every one of his fraudulent sales.  The Government presented evidence of seven such fraudulent transactions.  Thus, it is plainly wrong to say that Datil did not profit from the fraud.

Datil next argues that the only evidence of his guilty knowledge was the testimony that as a salesperson he attended Saturday sales meetings where the workings of the fraud were openly discussed.  He seems to imply that this is not sufficient.  However, this evidence, while compelling by itself, was not the only evidence of Datil's knowledge of the fraud.  As discussed above, Datil told Detective Potter that he was aware that numbers (i.e, income, rent, etc.) were being changed on his deals.  It was certainly reasonable for the jury to credit Potter's testimony concerning Datil's incriminating statements.

The majority of Datil's memorandum focuses on vague portions of testimony asserting that customers did not "blame Nelson" or did not have "anything negative to say" about him (Datil Mem. at 6-7), and then from there argues that there is reasonable doubt as to whether Datil

-31-

had knowledge of the fraud and that there was no evidence that Datil conspired to defraud. (Datil Mem. at 9). Whether or not Datil's customers think he was a pleasant person, appreciated his surface politeness, or blame him less than others for their experience at Shoreline Mitsubishi, is irrelevant. If anything, such "proof" merely demonstrates how effective a fraudster Datil was: so effective that his victims years later had some nice things to say about him. Notwithstanding all that background noise, as set forth above, Datil's participation in the scheme to defraud was established beyond a reasonable doubt. He participated in meetings, sold cars to customers who had insufficient income, including Melissa Bailey who purchased a full-sized Montero and Juanita Binns, who provided him with pay stubs indicating that she was earning less that $1,000 per month. He admitted to Detective Potter that he knew the fraud was going on and that he knew Royce Sullivan did not have a job when he left the dealership with his car. Datil also asked the Montalvos where Ms. Montalvo had previously worked, which led to the false information about Ms. Montalvo's employment and income being included on the credit application wired to Mitsubishi Credit on that transaction. In short, based on all the evidence, it was established that Datil was a knowing, active participant in the fraud.

## II.    Motions for New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms gives the trial court 'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992) (alterations by the Court)). In exercising its discretion conferred by Rule 33, the Court may weigh the evidence and evaluate

the credibility of witnesses. Sanchez, 969 F.2d at 1413 (citing United States v. Lincoln, 630 F.3d 1313, 1319 (8th Cir. 1980)). In so doing, however, the Court must defer to the jury's assessment of these matters. Sanchez, 969 F.2d at 1414; see also Ferguson, 249 F.3d at 133-34 ("Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.") (quoting Sanchez, 969 F.2d at 1414).

The burden of persuasion is on the defendant to demonstrate that a new trial is appropriate. United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" Ferguson, 249 F.3d at 134 (quoting Sanchez, 969 F.2d at 1414). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 249 F.3d at 134.

1.    Evidence of Mitsubishi Credit's Losses Was Properly Admitted

Hernandez argues that he is entitled to a new trial because the Court admitted evidence of loss that was irrelevant. This argument is without merit. The evidence of loss by Mitsubishi Credit was properly admitted and relevant to the jury's determination. "[P]roof that someone was actually victimized by the fraud is good evidence of the schemer's intent." United States v. Regent Office Supply Co., 421 F.2d 1174, 1181 (2d Cir. 1970); United States v. Foshee, 606 F.2d 111, 113 (5th Cir. 1979) ("The difficulty in proving specific intent to defraud in mail fraud cases has resulted in a liberal policy as to the admission of evidence tending to prove good or bad

faith…. This policy permit[s] the government to introduce any evidence remotely bearing on the question of fraudulent intent.  This includes evidence that loss was sustained as a result of the scheme.") (citations and internal quotation marks omitted).

The Court, over the Government's objection, limited the proof concerning Mitsubishi Credit's losses only to those transactions as to which there was specific evidence that the defendants and their coconspirators had engaged in fraud.  Although the Government believes that the Court could have permitted more evidence on this point, the limited evidence it did let the Government introduce was certainly relevant to the charged offenses.  Moreover, the defense attorneys ably cross-examined Greg Stiff of Mitsubishi Credit concerning Mitsubishi Credit's losses.  None of the defendants was prejudiced by the admission of this limited evidence.

2.    The Defendants Were Not Prejudiced By The Government's Rebuttal Summation

Hernandez and Datil seek a new trial based on a remark made by the prosecutor during the Government's rebuttal summation, a remark that was not objected to at the time it was made, but objected to at the conclusion of the Government's rebuttal argument.[16]  This argument lacks merit.

 The comment at issue, which was made in response to arguments advanced by defense counsel for Datil in his closing argument, did not constitute an impermissible reference to Datil's failure to testify, nor was it prejudicial.  It was rebuttal argument addressed at defense counsel's

---

[16]    David Brown and Richard Brown each purport to adopt any arguments made by co-defendants subsequent to the filing of their motions.  Presumably, this would include Hernandez and Datil's subsequently filed arguments concerning the Government's comment in rebuttal.  However, David Brown and Richard Brown have not met the requirements of Local Rule 47(b), concerning the incorporation by reference of co-defendants' arguments.  As such, the Court should not consider granting a new trial (or a judgment of acquittal) to David Brown or Richard Brown on the ground that the prosecutor's comment in rebuttal was improper.

arguments. In his closing argument, Datil's counsel sought to argue that the Government had not sufficiently established that the handwriting in question on Government Exhibit 30-01 was that of Datil. Datil's counsel advanced a number of arguments for this proposition, based largely on the fact that none of the witnesses testified that they saw Datil write the application in his own hand.[17] Datil's counsel did not advance other arguments that would have tended to support the opposite conclusion, i.e., that the writing was not Datil's because, for instance, he did not have access to the document, was not in a position to have been able to write it, or that it was someone else's writing or bore a likeness to that of another person such as Bailey or Ramos. The prosecutor sought to undermine defense counsel's argument that a witness needed to be produced who saw Datil actually write the application. In the context of defense counsel's argument, this was permissible rebuttal.

The comment by the prosecutor was not objected to at the time it was made, but rather was objected to at the conclusion of the government's rebuttal argument. The Court took up the matter at the sidebar and the jury was sent home for the day.[18] The next morning, before any

---

[17]     Counsel argued: "If Nelson put that $3,000 figure on himself, why didn't Melissa say 'I saw him do it? Nelson did it.'" and further argued, "...nobody knows who did that there. And it's unfair to assume under those circumstances that it must be Nelson, particularly since Melissa who was there doesn't say it was Nelson." (Tr. Einhorn, Aug. 30, 2005, at 29.) In response the prosecutor argued, "And Mr. Einhorn did not deny that it was his handwriting; he simply said Maria Ramos didn't say she saw him write it, or that Melissa Bailey didn't say she saw him write it. Well he could have written it at the dealership before he drove to Hartford." (Tr. Einhorn, Aug. 30, 2005, at 62.) As the Supreme Court stated in United States v. Young, 470 U.S. 1, 11 (1985), "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."

[18]     Counsel for Datil showed during the Government's initial summation that he was not shy about objecting immediately during his opponent's argument, as he did so on one occasion. Interestingly, although Datil's counsel took note of the exact time the prosecutor made
                                                                              (continued...)

other activity occurred before the jury, at the request of Datil and the other defendants, the Court gave a curative instruction directed precisely at this comment. The Court instructed the jury that to whatever extent the argument of Government counsel called upon any defendant to testify or to explain away any evidence, such argument was improper, uncalled for, and illegal. Additionally, as part of the Court's charge to the jury, the Court again instructed the jury that the burden of proof was solely with the Government, and that the defendants did not have any such burden.

As an initial matter, it bears mention that the comment at issue was isolated and particularly addressed to the arguments made by Datil's counsel. The comment could in no way have been interpreted by the jury to relate to the other defendants and thus Hernandez's argument that it related to him and the other defendants is wholly without merit.

More fundamentally, contrary to the assertions of Datil and Hernandez, there was no constitutional violation and no prejudice as a result of the comment. As the Second Circuit has held, "[a] prosecutor's statements during summation, if improper, will result in a denial of due process rights only if, in the context of the entire summation, they cause the defendant substantial prejudice." United States v. Rivera, 22 F.3d 430, 437 (2d Cir. 1994). In Rivera, the Second Circuit held that "[t]he determination of whether there was such prejudice depends largely on an analysis of the severity of the misconduct, the curative measures taken by the court, and the certainty of conviction absent the misconduct." Id. (citations omitted).

First, there was no misconduct here. The prosecutor was commenting on the arguments

---

[18](...continued)
the comment at issue in rebuttal, he waited to object in this instance until the prosecutor had completed his rebuttal summation.

made by defense counsel and the prosecutor's critique of defense counsel's assertions could not have been interpreted by the jury "naturally and necessarily' . . .  as a comment on the failure of the accused to testify."  United States v. Bubar, 567 F.2d 192, 199 (2d Cir. 1977) (citing United States ex rel. Leak v. Follette, 418 F.2d 1266 (2d Cir. 1969)).  There is a distinction between a comment by a prosecutor concerning a failure of the "defense" to counter or explain evidence and a failure of the defendant himself to do so.  See United States v. Castillo 866 F. 2d 1071 (9th Cir. 1988); United States v. Wasserteil, 641 F.2d 704, 709-10 (9th Cir. 1981) (holding that "'a comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege") (internal quotation marks and citation omitted).

As a general matter, the prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the Government's case, as well as his failure to support his own factual theories with witnesses.  Bubar, 567 F.2d at 199 (citing United States v. Dioguardi, 492 F.2d 70, 81-82 (2d Cir. 1974), United States v. Rodriguez, 556 F.2d 638, 641 (2d Cir. 1977); United States v. Lipton, 467 F.2d 1161, 1168 (2d Cir. 1972)).  "A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury 'naturally and necessarily' would interpret the summation as a comment on the failure of the accused to testify."  Bubar, 567 F.2d at 199.  Here, not only could counsel have made any number of additional arguments to distance Datil from the documents at issue, including highlighting the other co-conspirators who had access to the deal file before and after Datil and who stood to gain from the successful transaction, as well as the motivation of the purchaser to want to be approved, but counsel in fact did argue that "[s]he

[witness Melissa Baily] didn't say that because Nelson Didn't do it," referring to the handwritten document.  (Tr. Einhorn, Aug. 30, 2005 at 29).  Clearly, it was not Datil alone who had the information to contradict the Government's evidence, but a number of other arguments were or could have been advanced.

In Bubar, there were a number of comments by the prosecutor on a defendant's "failure to 'explain' or 'refute' certain evidence."  Id. at 199.  Here there was one comment.  In Bubar, the Court there found that there was no violation in those instances and reasoned that "[v]iewing such remarks in the context of the rebuttal summation as a whole, we do not believe that this ambiguous form of expression 'naturally and necessarily' would be interpreted by the jury as a comment on a defendant's failure to testify.  The thrust of the prosecutor's rebuttal summation was directed at the prior arguments of defense counsel.  We believe that the jury so understood the remarks in question."  Id. at 199-200.  Here the prosecutor's one comment which was clearly directed at the prior argument of defense counsel, even referencing defense counsel by name, could not have been interpreted by the jury as anything other than a comment on defense counsel's prior argument and could in no way naturally and necessarily have been a comment on Datil's failure to testify.[19]

Second, as was the case in Bubar, id. at 200, any conceivable misunderstanding by the jury on this point was cleared up by the Court's emphatic curative instruction which was given when the jury first returned to the courtroom the following morning, and the Court's instructions

---

[19]    The only damaging moment in the trial concerning Datil's testimony or lack thereof came in attorney Einhorn's opening statement, when he told the jury that Datil would testify in his own defense.  If any juror later wondered why Datil did not make good on Einhorn's promise in his opening statement, that certainly cannot be blamed on the Government.

regarding the burden of proof.  In fact the Court, over the objection of the Government, used nearly identical language used by then-District Judge Newman in the Bubar case – a case that was brought to the Court's attention by counsel for Datil.  Thus, even if there had been any problem created by virtue of the comment, the Court gave a timely curative instruction immediately upon the jury's next seating in the courtroom.  Accordingly, any possible prejudice was cured by the Court's prompt instructions.  See Id.; see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) (discussing the court's giving of explicit instructions--which the jurors are presumed to have understood and followed).

Finally, the strength of the Government case discussed above was such that evidence of guilt was overwhelming and the prosecutor's comment did not materially affect the verdict or affect the certainty of conviction.  See Rivera, 22 F.3d at 437; see also Kotteakos v. United States, 328 U.S. 750, 765 (1946) (the verdict must be left in "grave doubt" to require reversal due to an improperly admitted statement).  Accordingly, the argument that a new trial (or judgment of acquittal) is warranted based on the prosecutor's lone comment in rebuttal given in response to defense counsel's argument is without merit.

    3.    The Court Properly Excluded Extrinsic Impeachment Evidence

David Brown seeks a new trial based on substantially the same arguments he makes under Rule 29, again attacking the credibility of the witnesses, especially the former Shoreline employees.  These arguments do not support granting a new trial.  First, the Court should not usurp the role of the jury in weighing the credibility of witnesses.  See United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citation omitted).  Second, even if the Court were to weigh the credibility of the witnesses, the Court would find that on all of the relevant points the witnesses

were credible and corroborative of each other.

The one additional argument advanced by David Brown in support of a new trial is based on the Court's decision to exclude extrinsic evidence of a statement purportedly made by Vetre about taking his leased Lexus to a chop shop. David Brown asserts that this testimony would reflect on Vetre's credibility. Brown's argument in this regard is also without merit. In his cross-examination of Vetre, David Brown's counsel asked about this purported statement, and Vetre denied making it. Brown wanted to call James Jarmon, another former Shoreline employee, apparently to impeach Vetre by stating that Vetre indeed had made the comment about a chop shop that Vetre denied making on the stand. However, Rule 608(b) of the Federal Rules of Evidence states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved by extrinsic evidence." Finding that the proffered impeachment testimony was extrinsic, the Court granted the Government's motion in limine to exclude it. The Court was correct to do so. Whether or not Vetre sought to dispose of the Lexus illegally had nothing to do with his submission of a false credit application to obtain the Lexus in the first place. It was wholly extrinsic to the facts at issue in the trial. In any event, the defense attorneys cross-examined Vetre at great length, impeaching him repeatedly over his cooperation agreement and his false credit application made to obtain the Lexus. Vetre's credibility was more than sufficiently tested by defense counsel. Brown was not prejudiced by the Court's preclusion of the proffered extrinsic impeachment evidence.

## **CONCLUSION**

For the foregoing reasons, the Court should deny all defendants' motions for judgments of acquittal and a new trial in their entirety.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


/s/
JONATHAN BIRAN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No.  ct21922
Email: jonathan.biran@usdoj.gov

/s/
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct25713
157 CHURCH STREET
NEW HAVEN, CONNECTICUT 06510
(203) 821-3700
Email: michael.mcgarry@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on December 15, 2005, a copy of the foregoing was served by facsimile transmission and U.S. Mail on the following persons:

Richard S. Cramer, Esq.
449 Silas Deane Highway
Wethersfield, CT 06109
(counsel for David Brown)

Michael S. Hillis, Esq.
Dombroski Knapsack & Hillis LLC
129 Whitney Avenue
New Haven, CT 06511
(counsel for Richard Brown)

Kurt F. Zimmermann, Esq.
Silverstein and Osach, P.C.
234 Church Street, Suite 903
New Haven, CT 06510
(counsel for Angel Hernandez)

Jonathan J. Einhorn, Esq.
412 Orange Street
New Haven, CT 06511
(counsel for Nelson Datil)

_/s/_____
JONATHAN BIRAN
ASSISTANT U.S. ATTORNEY