UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------X
UNITED STATES OF AMERICA           :
                                   :
     V.                            :    NO. 3:02-CR-341 (EBB)
                                   :
ANGEL HERNANDEZ, DAVID BROWN,      :
RICHARD BROWN, AND NELSON DATIL,   :
                                   :
             Defendants.           :
----------------------------------X
```

## RULING ON DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL OR A NEW TRIAL

### I.    INTRODUCTION

Pursuant to Fed. R. Crim. P. 29(a) Defendants Angel Hernandez, David Brown, Richard Brown, and Nelson Datil each moved orally at the close of the Government's case-in-chief for a judgment of acquittal on all counts of the Fourth Superseding Indictment ("Indictment"). This Court reserved ruling on the oral motions. After the guilty verdicts were returned, and defendants renewed their motions orally, this Court directed defendants to submit supporting memoranda by September 12, 2005, with the government's opposition due on October 14, 2005.

### II.    The Indictment

The defendants were charged collectively with twenty-one counts of mail or wire fraud and one count of conspiracy to commit mail and wire fraud. The defendants were employees of Shoreline Motors Corporation ("Shoreline"), an automobile dealership located at 165 North Main Street, Branford,

Connecticut.  Shoreline was in the business of selling new and
used Mitsubishi automobiles.  Angel Hernandez was the General
Manager and a twenty-five percent owner of the dealership.  At
certain times relevant to the Indictment, David Brown, Richard
Brown, and Nelson Datil were salespersons at Shoreline.
Mitsubishi Motors Credit of America, Inc. ("Mitsubishi Credit" or
"MMCA") was headquartered in Cypress, California.  MMCA provided
financing to qualifying applicants at Mitsubishi dealerships
nationwide.  During the course of its business, Shoreline sent
credit applications and various financial documents on behalf of
its customers from the dealership, in Branford, to MMCA, in
California, using either interstate mail, via the United States
mails and/or private or commercial interstate carriers, or by
wire, via facsimile transmission ("faxing") or over the Internet.
Internet transmissions were made through a software program
called Daybreak Lending Software ("Daybreak").

The Indictment further alleges that Shoreline salespersons
instructed potential customers to complete credit applications by
providing certain personal information such as names, addresses,
sources of income, amounts of income, and rental expenses.  In
other circumstances, customers would provide this information
orally and a salesperson would complete the credit application.
On certain occasions, Shoreline employees, including Angel
Hernandez, rewrote the customer credit applications prior to

transmission to MMCA.  If Daybreak was used, the customer information would be typed into the program by Shoreline employees, including Angel Hernandez, and then sent over the Internet to MMCA.  Upon approval, MMCA would extend financing to Shoreline customers by wiring the funds to Shoreline.  The customers were then required to repay MMCA.

Shoreline obtained profits from MMCA and disbursed salary and/or commissions to Angel Hernandez, David Brown, Richard Brown, and Nelson Datil, among others.

With respect to the alleged conspiracy at Shoreline, Count One of the Indictment alleged that, from in or about February 2000 through in or about July 2002, each of the four defendants, and others, knowingly and intentionally combined, conspired, confederated and agreed to commit mail fraud and wire fraud, in violation of 18 U.S.C. 1341 and 18 U.S.C. 1343, respectively. The purpose of this conspiracy was for the defendants to obtain money from MMCA and from Shoreline's customers through fraudulent means.  Additionally, the Indictment charges these defendants with substantive counts of mail and wire fraud.  Hernandez was charged with all twenty-two counts of mail and wire fraud.  David Brown was charged in Counts Three, Four, Five, Ten, Fifteen, and Twenty-one.  Richard Brown was charged in Counts Eight, Eleven, Twelve, Seventeen, and Eighteen, but was acquitted on Counts Eight, Eleven, and Twelve.  Nelson Datil was charged in Counts

Nice, Fourteen, Nineteen, Twenty, and Twenty-two.  Hernandez,
David Brown, and Nelson Datil were each convicted of all charges
against them.

When Angel Hernandez and others rewrote the credit
applications, they allegedly substituted false information for
some of the truthful information provided by the customers in
order to make those customers appear more creditworthy and to
induce MMCA to extend credit in circumstances where MMCA might
not otherwise have done so.  It was further alleged that the
salespersons, including David Brown, Richard Brown, and Nelson
Datil, wrote first drafts of some credit applications using false
information in place of the truthful information provided by the
Shoreline customers.  Also, using the Daybreak software, the
defendants were alleged to have typed false information into an
electronic version of the credit applications to be sent to MMCA
after receiving truthful information from their customers.  By
sending false information to MMCA, the defendants and others
successfully tricked MMCA into extending credit to customers MMCA
would not likely have deemed to be creditworthy if the
information transmitted had been truthful.  After the false
credit applications were sent to MMCA, the initial customer
credit applications were destroyed by defendant Hernandez or
other Shoreline employees.

The Indictment further alleges that the defendants purposely

4

failed to inform customers of large balloon, or final, payments included in the contracts. These balloon payments were often in excess of ten to fifteen times the amount of the regular monthly payments required under the contract.

The so-called "Monroney stickers" were also allegedly removed from vehicles in an effort to conceal from the customers the Manufacturer's Suggested Retail Price ("MSRP") of various vehicles on Shoreline's lot. The defendants then charged their customers a price higher than the MSRP and, in some cases, higher than the price the customers had agreed to pay. The defendants also charged customers for extended service contracts even in circumstances where a customer expressly rejected such a contract or was unaware that one was available. Certain customers were charged for CD changers that were never installed. Often, these customers did not request a CD changer and were unaware that they had been charged for one.

## III. <u>Timeliness Under Rules 29, 33, and 45</u>

"The court may not extend the time to take any action under Rules 29, 33, 34, and 35, except as stated in those rules." Fed. R. Crim. P. 45(b). Under Rule 29, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7-day period." Fed. R. Crim. P. 29(c). Under Rule

33, "[a]ny motion for a new trial grounded on any reason other
than newly discovered evidence must be filed within 7 days after
the verdict or finding of guilty, or within such further time as
the court sets during the 7-day period." Fed. R. Crim. P.
33(b)(2). It is not disputed that a court may grant timely filed
initial and subsequent motions for extension of time to file
post-trial motions and supporting memoranda. See United States
v. Robinson, 303 F.Supp.2d 231, 234 (N.D.N.Y. 2004).

On September 7, 2005, the jury returned a verdict of guilty
on all or some of the charges against each of the four
defendants.[1] After the verdict was entered, the defendants
renewed their oral motions for a judgment of acquittal or, in the
alternative, a new trial. This Court set the following
deadlines: memoranda in support of the defendants' Rule 29 and
Rule 33 motions were due on September 28, 2005; the government's
opposition was due on October 14, 2005; and defendants' replies,
if any, were due on October 21, 2005. Prior to September 28th,
with the consent of the government, Defendant Hernandez moved for
an additional 30 days to file his post-trial motions and
memorandum in support thereof. This Court granted Hernandez's
request and his deadline was extended by roughly a month until
October 31, 2005. The government's deadline to file its omnibus

---

[1] As this Court recalled earlier, Hernandez, David Brown, and Datil were
found guilty of each count alleged against them in the indictment. Richard
Brown was found guilty of three of the six counts alleged against him.

response was extended accordingly.  Unfortunately, Hernandez did not file his supporting memorandum until November 15, 2005 - over two weeks after the expiration of his additional 30 days.  Datil filed his memorandum in support of his oral motion for a new trial and/or judgment of acquittal on November 7, 2005 - approximately five weeks after the expiration of this Court's original deadline of September 28, 2005.  On December 20, 2005, after the government filed its opposition and more than eleven weeks after the defendants' original deadline, Datil filed a motion nunc pro tunc for permission to file out of time. Defendant Richard Brown submitted his motions and supporting memorandum one day after the deadline on September 29, 2005.  The government did not object to his late filing.  Defendant David Brown filed a motion for extension of time on October 5, 2005, after the deadline passed, but no objection was made by the government.  This Court granted the extension to David Brown, after which he timely submitted his papers.

Until recently, the United States Supreme Court has treated the time limitations found in Rules 29 and 33 as jurisdictional. Compare United States v. Robinson, 361 U.S. 220, 229 (1960) and United States v. Smith, 331 U.S. 469, 474 n.2 (1947) with Kontrick v. Ryan, 540 U.S. 443, 456 (2004).  However, in a recent decision, Eberhart v. United States, 126 S.Ct. 403 (Oct. 31, 2005), the Supreme Court revised its treatment of Rules 29, 33,

and 45.  Now, Rule 45(b)'s limitation on extensions of the time
limits found in Rules 29 and 33 is considered a "claim-processing
rule," not a jurisdictional limitation.  <u>Eberhart</u>, 540 U.S. at
407.  While <u>Eberhart</u> dealt with the grant of a new trial under
Rule 33, the Court held that "Rule 45(b)(2) has precisely the
same effect on extensions of time under Rule 29 as it does under
Rule 33 ...."  <u>Id.</u>  Because these rules are not considered
jurisdictional, they can be waived if the issue of untimeliness
is not raised by the government in its opposition.

In <u>Eberhart</u>, the defendant submitted his motions for a
judgment of acquittal and a new trial on the last day available.
<u>Id.</u> at 404.  He did not file his "supplemental memorandum" in
support of his motion until almost six months later.  <u>Id.</u>  In
that late memorandum, the defendant raised two additional issues
upon which his motion was based.  <u>Id.</u>  The government responded
to the memorandum by addressing its merits without asserting the
untimeliness defense.  <u>Id.</u>  The court denied the defendant's
motion for a judgment of acquittal, but granted his motion for a
new trial based, in part, on the issues raised in the tardy
memorandum.  <u>Id.</u>  The Seventh Circuit reversed the district
court's grant of a new trial finding that Rule 45(b)'s limited
prohibition on extensions of time was "mandatory and
jurisdictional" and the district court therefore did not have the
authority to entertain the tardy memorandum.  <u>Id.</u>, citing

8

Eberhart v. United States, 388 F.3d 1043, 1049 (7th Cir. 2004).
On appeal, the Supreme Court held that the time limitations at
issue in Eberhart (Rules 29, 33, and 45) are not jurisdictional,
but rather are merely "claims-processing rules."  Therefore,
contrary to the Seventh Circuit's decision, the district court
was not precluded, jurisdictionally, from entertaining a tardy
memorandum in support of a Rule 33 motion.  Id. at 406-07.
However, the Court also held that, where the government properly
raises the untimeliness issue, a district court must reject any
documents filed after the relevant deadline.  If, however, the
government fails to raise the untimeliness defense and addresses
only the merits of the defendant's Rule 29 or Rule 33 motion, the
government forfeits the defense found in Rule 45(b).  In
Eberhart, the government failed to raise the untimeliness issue
and therefore the district court properly entertained the
defendant's tardy memorandum.

     Here, Richard Brown filed his motion and supporting
memorandum of law one day late on September 29, 2005.  However,
because the government did not object, it has forfeited the
opportunity to do so and this Court will consider the merits of
Richard Brown's motions and memorandum.

     David Brown sought an extension of time on October 5, 2005,
which was granted by this Court extending the deadline to October
31, 2005.  Though David Brown's request for more time was late,

the government has not objected to this tardiness and, therefore, has waived that opportunity. The Court will address the merits of David Brown's motions and memorandum.

Hernandez was granted an extension of time to file his memorandum, but he failed to do so within that extended period. Datil failed to file within the period originally set by this Court following the jury verdict, and also failed timely to request an extension. The government has objected to both Hernandez's and Datil's motions for a new trial and judgment of acquittal based, in part, on their failures to meet the deadlines set by this Court. Since the government has properly objected to the untimely memoranda filed by Hernandez and Datil, this Court is required to disregard their tardy memoranda and hereby renders its decision to deny the motions of Hernandez and Datil for a judgment of acquittal or a new trial. For the sake of thoroughness, however, this Court will also examine the merits of each defendant's motions and supporting memoranda.

IV.  **Legal Analysis**

   A.   **Rule 29 Motion For Judgment of Acquittal.**

Rule 29(a) of the <u>Federal Rules of Criminal Procedure</u> provides, in pertinent part, that the Court, on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A district court can enter a judgment of

acquittal where the evidence is insufficient "only if, after
viewing the evidence in the light most favorable to the
prosecution and drawing all reasonable inferences in the
government's favor, it concludes no rational trier of fact could
have found the defendant guilty beyond a reasonable doubt."
United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)); see also
United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).
When considering a motion for a judgment of acquittal, "the court
must be careful to avoid usurping the role of the jury."
Guadagna at 129.  The court must give "full play to the right of
the jury to determine credibility, weigh the evidence, and draw
justifiable inferences of fact" in determining whether a
reasonable mind might fairly conclude guilt beyond a reasonable
doubt was established upon the evidence.  Id. (quoting United
States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).  A Rule 29
motion does not give the trial court "an opportunity to
substitute its own determination of the weight of the evidence
and the reasonable inferences to be drawn for that of the jury."
Id. (internal quotations and citation omitted).

      In addition, a jury is entitled to reach its verdict based
"entirely on circumstantial evidence," United States v. Martinez,
54 F.3d 1040, 1043 (2d Cir. 1995) (citations omitted), and "the
government need not 'exclude every reasonable hypothesis other

than that of guilt.'" <u>Guadagna</u> at 130 (quoting <u>Holland v. United
States</u>, 348 U.S. 121, 139 (1954)).  A defendant, therefore,
"shoulders a heavy burden" in bringing a challenge to the weight
of the evidence supporting a conviction.  <u>United States v.
Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotations
and citation omitted).

**B.    Rule 33 Motion For New Trial.**

A court may grant a motion for a new trial in a criminal
case "if the interests of justice so require." Fed. R. Crim. P.
33.  The standards governing motions for a new trial are strict,
and a district court may grant a new trial only in 'the most
extraordinary circumstances.'" <u>United States v. Camacho</u>, 163
F.Supp.2d 287, 310 (S.D.N.Y. 2001), <u>citing</u> <u>United States v.
Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995).  "Rule 33 authorizes a
district court to order a new trial if one is required in the
interest of justice." <u>United States v. Shkolir</u>, 17 F.Supp.2d
263, 266 (S.D.N.Y. 1998).  The rule provides broad discretion to
the trial court to order a new trial in order to avert a
perceived miscarriage of justice.  <u>Id.</u>; <u>see</u> <u>United States v.
Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992).  "A defendant
seeking a new trial bears the burden of demonstrating the
'essential unfairness of the [original] trial.'" <u>Shkolir</u>, 17
F.Supp.2d at 266, <u>citing</u> <u>United States ex rel. Darcy v. Handy</u>,
351 U.S. 454, 462 (1956).

In reviewing a Rule 33 motion, this Court is not compelled to view the evidence in the light most favorable to the Government. United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980). "The Court's discretion is, however, somewhat limited in that it should only grant a new trial when it 'concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred.'" United States v. Ferguson, 49 F.Supp.2d 321, 323-24 (S.D.N.Y. 1999), citing Lincoln, 630 F.2d at 1319. Rule 33 motions are not favored and should be granted only in exceptional circumstances, and even then with great caution. Id., citing United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958). "It is only where an injustice has been done such that an innocent person may have been convicted that there is a need for a new trial." Id. "When a defendant alleges that prosecutorial misconduct entitles him to a new trial, he faces a substantial burden because the misconduct alleged must be so severe and significant as to result in the denial of a fair trial." United States v. Muyet, 994 F.Supp. 501, 520 (S.D.N.Y. 1998).

## V.   Rule 29 Motions For Judgment of Acquittal

### A.   Conspiracy to Commit Mail and Wire Fraud (Count One).

To prove a section 371 conspiracy, the government must prove

that (1) an agreement exists between two or more persons to commit an unlawful act; (2) the defendants knowingly engaged in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) one or more members of the conspiracy committed an "overt act" in furtherance of the conspiracy.  U.S. v. Reyes, 302 F.3d 48, 53 (2d Cir. 2002); see United States v. Samaria, 239 F.3d 228, 234 (2d Cir. 2001). "Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir.), cert. denied, 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994), it must prove that 'the intended future conduct they ... agreed upon include[s] all the elements of the substantive crime.'" United States v. Rose, 590 F.2d 232, 235 (7th Cir. 1978), cert. denied,442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

In this case, the government alleged that the defendants, and others, conspired to violate the mail and wire fraud statutes found at 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively. Those statutes require the government to prove (1) a scheme to defraud, (2) to get money or property, that is (3) furthered by the use of interstate mail or wires.  United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).  The government's theory was that these defendants engaged in an unlawful agreement to

14

fraudulently induce MMCA to extend credit to various Shoreline customers in order to receive the profits and commissions generated from the fraudulent sales, and that the defendants used interstate mail and/or wire services to facilitate this unlawful agreement.

### 1.    The Agreement to Commit An Unlawful Act.

As to the first element of a section 371 conspiracy, the existence of an unlawful agreement, the government offered the testimony of former Shoreline employees who each testified about the existence of the conspiracy at Shoreline.  These witnesses included Bruce Vetre, Jose Espinosa, Louis Pierro, James Clanton, and Jose Concepcion.  Each of these cooperating witnesses pled guilty to conspiracy charges directly related to the conspiracy charged in the Indictment in this case.  The cooperating witnesses' testimony was consistent with the Government's theory that the managers and salespersons at Shoreline Mitsubishi entered an agreement to supply false information to MMCA and the Shoreline customers.  According to these witnesses, the goal of this alleged conspiracy was to induce MMCA to finance the purchase of vehicles from Shoreline Mitsubishi by customers who would not otherwise have been granted financing on the terms to which the parties ultimately agreed.  The witnesses also testified that Shoreline deliberately withheld from its customers information regarding additional costs, including the

15

installation of CD changers and additional service and insurance contracts, in order to receive payment for items never delivered or requested.  This increased the amount financed by MMCA, thereby increasing the defendants' profits.

The government's witnesses further testified that the credit applications containing false information were mailed or wired to MMCA in California, and that they understood that MMCA relied on the information in these credit applications to decide whether, and on what terms, it would extend credit to the various applicants.  The Government offered evidence concerning more than twenty-five different car purchases from Shoreline Mitsubishi involving false financial information on customer credit applications.

The Government also offered the testimony of many Shoreline customers involved in the underlying deals.  These customers testified that they provided Shoreline with truthful and accurate information about their respective income and expenses, job status, and job titles.  The jury also saw the applications for credit that had been transmitted to MMCA containing false information.

Many customers testified that they were never told about the balloon payments.  These balloon payments had the effect of lowering the regularly scheduled monthly payments by requiring a much larger payment at the close of the payment schedule.

Despite extensive interaction with Shoreline managers and salespersons leading to the sale of each vehicle, the customers testified that they only received information regarding their monthly payments.  The government alleged that this was done to dupe customers into believing that their low monthly payments were the extent of their financial obligation to MMCA.

Finally, there was testimony that salespersons stole all or a part of the cash down payments paid by certain customers. Whatever amount was stolen was then added to the amount the customer financed in order to make up the difference.  There was also testimony that customers were not provided with the Monroney sticker required to be given to each purchaser.

The government witnesses testified that this unlawful agreement was planned and discussed during "Saturday Sales Meetings," mandatorily attended by managers and salespersons. Angel Hernandez organized and lead these meetings, often instructing salespersons and managers to communicate during the credit application process to ensure that only one employee, either a manager or salesperson, falsely adjusted the customer information.  Since there was evidence that every salesperson and manager was required to attend these meetings, the jury could infer that the defendants were aware of the fraudulent agreement.

     **2.    The Defendants Knowingly Engaged in the Conspiracy With The Intent To Commit Mail and Wire Fraud.**

The second element that the government needed to prove to

establish the section 371 conspiracy is that the defendants knowingly engaged in the conspiracy with the intent to commit an offense in furtherance of that conspiracy.

          a.   Angel Hernandez

Hernandez was the general manager of Shoreline Mitsubishi and also a partial owner of the company.  In his capacity as general manager, he was responsible for the sales and financing operations of the company.  Vetre, Pierro, and Concepcion testified that Hernandez gave them instructions to alter the financial information on the customers' credit applications. According to the government's evidence, Hernandez expressly stated at the Saturday Sales Meetings that MMCA required a certain minimum level of financial stability determined, in part, by analyzing an applicant's income to debt ratio.  Hernandez further instructed that the managers were responsible for the increase of the stated monthly incomes of customers that did not meet MMCA's minimum requirements.

Vetre also testified that Hernandez supplied him with blank rental agreements so that Vetre could falsely claim that certain customers were receiving rental income.  This fictitious rental income was stated on certain MMCA customer credit applications and transmitted to MMCA.  The fake rental agreements were filled in and used as proof of this fictitious rental income.  The customers testified that they were unaware that this was done.

18

b.    <u>Salesperson Defendants</u>

Shoreline salespersons were required to elicit pertinent financial information from customers and record this data on the customers' credit applications.  According to the evidence produced at trial, a customer's financial information would be adjusted, when necessary, by Shoreline salespersons prior to transmission to MMCA.  Additionally, when the managers altered the financial data, salespersons knew that this was done and that their role was to obtain basic information from each customer so that the managers could later manipulate it prior to transmission to MMCA.  Former employees testified that Richard Brown, David Brown, and Nelson Datil were aware that, if one of their customers could not gain credit approval with truthful financial information, the managers would change that information to assure approval.

1.    <u>David Brown</u>

David Brown was Wesley Witcher's salesperson.  Wesley testified that David Brown completed the credit application on his behalf.  His application indicated that Wesley's mother and co-signer, Shirley, was working for Pratt & Whitney and earning $41,000 per year at the time Wesley applied for credit.  Wesley and Shirley testified, however, that they both told David Brown that Shirley was unemployed.  Further, Wesley testified that he told David Brown that he was earning $22,000 per year, but his

19

application ultimately showed that he was earning $29,000 per
year.  The jury could infer that David Brown changed these
numbers, or that he knew a manager would do so in order to gain
credit approval.

The jury also heard testimony that David Brown left the
income field blank on another customer's credit application and
instructed Vetre to create an income that would "match" the
monthly payment.  Vetre testified that this was not an isolated
incident.

Vetre also told the jury that a Shoreline customer, Andrea
Williams, had an outstanding debt from a previous car loan and
MMCA required that debt to be satisfied before it would lend her
money for the purchase of a new car.  Vetre arranged for the
preparation of false money orders that would give the appearance
that the debt had been paid.  According to Vetre, David Brown was
Williams' salesperson and was aware of this plan.  David Brown
received a commission after MMCA approved Ms. Williams' credit
application.  Further, Vetre and Concepcion testified that David
Brown was aware that Vetre's fishing rod business, Vetre Rod
Crafting ("VRC"), would be falsely listed as the employer of a
Shoreline customer who was, in fact, unemployed and had never
heard of VRC.

The government presented sufficient evidence for the jury to
conclude that David Brown was aware of, and knowingly engaged in,

the conspiracy alleged in Count One and that he did so with the intent to transmit, or cause the transmission of, false credit applications to MMCA through interstate mail or wire.

        2.   <u>Nelson Datil</u>

The government offered evidence that Nelson Datil admitted to a former Branford detective that he was aware of the income inflating scheme at Shoreline.  Datil also stated that he knew certain customer information, including job status and income, had been changed on credit applications involving Datil's customers.  Much of this evidence was corroborated by the customers involved in his deals.

According to the government's evidence, Datil also traveled to a customer's house in Hartford to have purchase documents signed by the buyer, Ms. Bailey, and her co-signer, Ms. Ramos. Ms. Bailey testified that Datil failed to disclose the balloon payment during his visit.  Moreover, the credit application indicates that Ms. Ramos was receiving $3,000 per month from the Social Security Administration (SSA).  This was false information.  Further, Ms. Bailey testified that she did not complete the application herself, and the government offered evidence that the handwriting on the application matches Datil's.

In another instance, Datil admitted, to the former detective, that he was aware that a customer, Royce Sullivan, was unemployed when his credit application was sent to MMCA.

Nonetheless, the credit application indicated that Mr. Sullivan was gainfully employed.  That customer never made a single payment to MMCA and the car was repossessed.

### 3.  Richard Brown

Richard Brown argues that the government failed to prove he intended to engage in the conspiracy at Shoreline Mitsubishi.  He claims that there was no specific evidence that he personally altered any of the customer's financial information.  For instance, the defendant claims that Vetre's testimony proved only that salespersons, in general, collected the credit applications and delivered them, with truthful information contained therein, to the managers at Shoreline.  If the managers changed information, Richard Brown claims, he should not be held responsible for their actions.

However, as mentioned earlier, there was evidence that Richard Brown, as a Shoreline salesperson, attended the Saturday Sales Meetings and was aware of the conspiracy.  Further, false financial information was submitted by Shoreline to MMCA on credit applications involving customers of Richard Brown.  Danielle Fowler's application contained false information regarding her cosigner, Ana Burgos, and her salary and place of employment (she was unemployed).  Richard Brown knew Ms. Burgos personally, and there was evidence that he understood that she was unemployed at the time of Fowler's application and also that

Richard Brown's handwriting was on the Fowler credit application. The jury could infer that Richard Brown was aware of the scheme to defraud MMCA and that he knowingly participated in it.

> **3.   There Was Sufficient Evidence That More Than One Of The Overt Acts Charged In The Indictment Was Committed By One Or More Members Of The Conspiracy.**

Finally, as to the third element of the section 371 conspiracy, the government provided extensive documentary evidence and testimony by Shoreline customers and employees in order to prove that one or more of the overt acts charged in paragraphs 33 through 40 of the Indictment were committed by one or more of the members of this conspiracy.

A court must enter a judgment of acquittal only where the evidence is insufficient to sustain a conviction.  In recognition of the vast amount of evidence offered by the government, and the jury's right and duty to determine the relative weight and credibility of this evidence, this Court finds that there was sufficient evidence to allow the jury to return a guilty verdict on Count One as to each defendant.  Defendants' Rule 29 motions with respect to the conspiracy charged in Count One are denied.

> **B.   Wire Fraud and Mail Fraud (Counts Two - Twenty-two).**

The elements of mail or wire fraud are (1) a scheme to defraud, (2) to get money or property, (3) furthered by the use of interstate mail or wires.  United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).  "Whoever commits an offense against the

23

United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. ¶ 2(a). "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. ¶ 2(b).

With respect to the second and third elements of mail and wire fraud, it is clear that the goal of the defendants was to receive money – in the form of salary, commissions, and profits – and that the interstate mails and wires were used.

As to the first element, a scheme to defraud, "the government was required to prove [(1)] the existence of a scheme to defraud, [(2)] the requisite scienter (or fraudulent intent) on the part of the defendant, and [(3)] the materiality of the misrepresentations." Autuori, 212 F.3d at 115 (internal citations omitted). A defendant may be found "guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975). For the sake of specificity, some information referred to in the section of this opinion referring to the conspiracy count will be reiterated below where appropriate.

### 1.    Angel Hernandez

Angel Hernandez was found guilty on each and every count of the twenty-two count indictment.  He argues that the first essential element of mail and wire fraud, the existence of a scheme to defraud, was not proven by the Government.  More specifically, Hernandez argues that the government did not prove that material false representations were made to MMCA or the Shoreline customers.  As discussed earlier in this ruling, the fraud alleged in the conspiracy count was more than adequately proven by the government.

### a.    The Shoreline Customers.

Hernandez claims that because the customers were provided with written documents outlining the terms of the transactions, any misstatements made verbally by the defendants were not material.  Hernandez claims that, regardless of what each customer was told, each was provided with full written disclosure of the terms of his or her deal and, therefore, any prior misrepresentations made by defendants were cured.  Given the circumstances of the so-called "written disclosure," this argument is unconvincing.

At trial, Shoreline customers testified that in some cases material terms of the agreement, including the "hard adds" such as CD changers, were left out of the final, signed paperwork that Hernandez claims cures all prior misrepresentations.  Further,

25

many customers testified that the defendants never explained the final terms of their deals, and that they were rushed through the signing of the final paperwork.  In many cases, the final paperwork included terms, such as balloon payments and CD changers, that were never discussed with the customers.

In particular, one customer, Jose Santiago, explained to the jury that he provided a down payment in the amount of $3,000, but the paperwork that was ultimately transmitted to MMCA reflected a down payment of only $2,000.  Santiago did not realize this until long after the paperwork was processed and he had taken possession of his car.  Further, Vetre testified that customer signatures were forged from time to time where customers had not signed the final paperwork or when terms were added after the customer had signed the documents.

As previously stated, customers testified that they were rushed through the final paperwork by Shoreline employees, and that this deprived them of the opportunity to fully understand what they were about to sign.  In many other instances, customers who did not understand English could not read or understand the documents they were signing or initialing.  Interpreters were not provided and the Spanish speaking Shoreline employees did not explain the terms of the agreement to those who did not understand English.  Those customers were forced to rely on what they were originally told by their respective salespersons.

These customers relied on the defendants and others to provide honest and accurate disclosure.  There was ample evidence from which a jury could infer that the defendants added or changed terms in the written agreements that were not discussed orally. By rushing the excited customers while they were signing the final paperwork and failing to provide an interpreter to explain the written terms, defendants were able to manipulate the terms of the purchase agreements without the knowledge of their customers.  "A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." <u>Autuori</u>, 212 F.3d at 118.

### b.    Mitsubishi Motor Credit

The evidence of material misrepresentations made by the defendants to MMCA was even more convincing.  A representative of MMCA, Steven Van Overen, testified that MMCA relied on the credit applications in making its decision whether to extend credit to its applicants.  Van Overen testified that MMCA relied on the dealerships to provide truthful and accurate information.  Van Overen further testified that the information on each credit application, together with other information about the applicant, is used to determine the applicant's creditworthiness and should allow MMCA to accurately assess the risk posed by each applicant.

Further, the government offered the testimony of former

27

Shoreline employees who testified that everyone at Shoreline was aware that MMCA relied on the credit applications and that it was necessary to make Shoreline's customers appear more creditworthy. MMCA's dependence on these applications and their importance in MMCA's decision making process were some of the reasons defendants and others manipulated the credit application. Former Shoreline employees testified that Defendant Hernandez was responsible for creating and implementing this plan. Hernandez even warned his staff to be careful not to artificially increase particular incomes twice because gross inflation might cause MMCA to become aware of this scheme. He instructed the salesmen to report their increases to the managers so that the income would not be increased a second time.

    "[A] defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." Cephas v. Nash, 328 F.3d 98, 101 n.3 (2d Cir. 2003). The government's evidence of Hernandez's leadership role in this fraud, including the hosting of the Saturday Sales Meetings where the fraud was discussed, was abundant. Hernandez's argument that the government needed to demonstrate "the exact way" in which the information was relied upon is not convincing. Actual reliance is not required to prove a violation

of the mail and wire fraud statutes.  <u>Neder v. United States</u>, 527
U.S. 1, 24-25 (1999).  A reasonable jury could determine that all
of the information collected by MMCA was used to make its
assessment of each applicant's creditworthiness.  As a result,
Hernandez's Rule 29 motion is hereby denied.

### 2.  David Brown

#### a.  Count Three (Wesley/Shirley Witcher)

David Brown was found guilty of wire fraud alleged in Counts
Three, Four, Five, Ten, Fifteen, and Twenty-one.

The deal at issue in Count Three is the Witcher deal,
referenced earlier in this opinion.  David Brown argues that the
Witcher's testimony concerning this deal was "patently
incredible" and a reasonable jury could not have believed it.

In support of this assertion, the defendant cites minor
discrepancies in the Witcher's testimony.  For example, the
defendant points out that at one point Shirley Witcher told an
FBI agent that David Brown was with her son when he picked her up
prior to co-signing the loan.  At trial, however, Shirley Witcher
denied making this statement.  Such a minor discrepancy in her
testimony does not render it "patently incredible," and this
Court declines the invitation to disregard the jury's verdict
based on such trivial incongruity.

The Witcher credit application lists Shirley as the primary
applicant and indicates that she was employed at the time by

Pratt & Whitney earning $41,000 per year.  Wesley and Shirley
Witcher testified that David Brown knew Ms. Witcher had not
worked at Pratt & Whitney since 1977, and that she never earned
$41,000 per year.  Wesley testified that he gave accurate and
truthful information to David Brown, the only person with whom
Wesley dealt at Shoreline.  Wesley told David Brown that he was
paying $775 per month in rent, however the line on the credit
application for rent was left blank.  Wesley testified that he
does not know why the information he provided was misstated or
omitted.  Finally, as with other customers, Mr. Witcher did not
realize he was paying $650 for a CD changer that was never
installed, and he did not know about the balloon payment.

     These misstatements and omissions are consistent with the
overall scheme perpetrated at Shoreline Mitsubishi and described
earlier in the section of this opinion dealing with the
conspiracy count.  They are consistent with the government's
theory that the salesmen knowingly participated in the scheme, in
an effort to reap large commissions.  The jury was well within
the boundaries of reasonable judgment when it concluded that
David Brown either altered this credit application himself, or
delivered it to a coconspirator with the knowledge that his
coconspirator would make the necessary alterations.

      **b.**    **Counts Four (Willard Hyman/Andrea Williams)
          and Five (Andrea Williams)**

     The credit applications submitted to MMCA on behalf of

Andrea Williams as a co-signor (Count Four) and a principal borrower (Count Five) contained false information regarding her income. Also, as stated earlier, MMCA was tricked into believing that Ms. Williams' preexisting auto loan had been paid in full. David Brown was the salesman associated with both transactions and he received a commission related to each sale.

Ms. Williams testified that she told David Brown that she earned roughly $20,000 per year while working for a company called Entrem; however her credit application indicates that she was earning $39,000 per year. Ms. Williams was unaware that this information had been changed. Further, she testified that she was unaware that MMCA required proof that her preexisting loan had been satisfied, and she knew nothing of the phoney money order scheme.

The defendant admits he was the salesman associated with each of the Williams deals, but he claims that because Andrea Williams was unable to identify him as having personally altered her credit application, the jury's verdict was unreasonable. However, the jury could infer from the overall scheme, the Witcher's testimony, and Mr. Vetre's testimony that David Brown knowingly participated in a scheme to defraud MMCA by altering Ms. Williams' credit application.

31

      c.    **Counts Ten (Lisa Browdy), Fifteen (Pam and Marie Bozzuto), and Twenty-One (DiMauro Family).**

David Brown argues that, while the customers involved in Counts Ten, Fifteen, and Twenty-One testified that they were not responsible for the misstated financial information on their credit applications, none was able to claim that he or she actually saw David Brown alter that information.

The government produced evidence that David Brown was the salesperson associated with the transactions referenced in Counts Ten, Fifteen, and Twenty-one. As previously described, David Brown was responsible for obtaining the customers' financial information and delivering the draft applications to a finance manager. Some information was later altered before appearing on the final version of the credit application.

Lisa Browdy, cosigner for Gwen Morgan, testified that her income is misstated on her credit application. She told David Brown that she was making $800 to $1,000 per month, but the application states she was making $3,900 per month. Further, she was paying roughly $725 to $750 per month for rent; however the application indicates her rent cost only $250 per month. Ms. Morgan's rent and income are misstated as well.

Marie Bozzuto cosigned Pam Bozzuto's application for credit. Marie was unemployed at the time, but her application states she was working for VRC, Vetre's fishing rod company. Vetre

testified that David Brown knew that VRC would be falsely listed as Marie's employer.  The application also falsely indicates Marie was receiving monthly income from VRC in the amount of $3,400.

Information relating to Mr. and Mrs. DiMauro's pension and social security income was misstated on their application as well.  Mr. DiMauro testified that he provided accurate and truthful information.

Again, these customers testified that they offered truthful information to David Brown and that they were not aware that information had been misstated.  There was abundant evidence that David Brown was aware of the scheme at Shoreline.  The jury could infer that the defendant falsified financial information or knew that such information had been misstated with respect to each of these customers.

### 3.    Richard Brown

Richard Brown argues that the salesperson's responsibility did not extend beyond merely showing the dealership's vehicles, recording truthful information supplied by the customers, and delivering that information to his superiors.

In contrast, the government offered a substantial amount of circumstantial evidence of Richard Brown's awareness of, and participation in, the fraud perpetrated at Shoreline Mitsubishi. Espinosa testified that salespersons would routinely "bump up"

33

the customers' income, even in circumstances involving customers with good credit because a customer's good credit rating would prevent any suspicion on the part of MMCA caused by the higher reported income.

Also, Vetre, Espinosa, Concepcion, Pierro, and Clanton testified that this scheme was discussed on numerous occasions during the aforementioned Saturday Sales Meetings and that salespersons, including Richard Brown, were required to attend these meetings.

### (a)    Count Seventeen (Santana/Agosto)

Rosa Santana purchased a car from Shoreline Mitsubishi and dealt with Richard Brown. She referred to him as "Diamond" and pointed to him in court. Maria Agosto co-signed on Santana's car loan from MMCA. At the time Santana applied for credit, she was paying rent in the amount of $475 per month. The credit application indicates she was paying only $200 per month. Santana's credit application states that Agosto was receiving a pension; however, in reality, Agosto was receiving only social security income – she never received a pension. Santana testified that neither she nor anyone else told Richard Brown, or any other Shoreline employee, that Agosto was receiving pension income.

Santana also testified that she was not told that there would be an additional charge for her CD changer and service

34

contract, or that there would be a balloon payment at the end of her finance term.  As other witnesses testified, Santana stated that she was rushed through the paperwork during the closing.

The government provided sufficient evidence for the jury to conclude that Richard Brown was aware of the fraudulent scheme at Shoreline and that he participated in that scheme with the intent and understanding that either he or a manager would substitute false information for some of the truthful information on the credit application.  The jury could conclude that Richard Brown knew this information would be sent either by mail or by wire to MMCA in California, and that he and the managers would receive a commission on the sale if this customer was approved for financing.

Santana's testimony was consistent with the testimony of other customers and with that of many former Shoreline employees. The jury could reasonably conclude that, if Richard Brown did not personally alter Rosa's application, he knew it would be altered by a manager and that it would contain false information when it was sent to MMCA.

**(b)  Count Eighteen (Fowler/Burgos)**

Danielle Fowler, having known Richard Brown prior to the underlying transaction, purchased a car from Shoreline Mitsubishi and her salesman was Richard Brown.  Ana Burgos, the mother of Fowler's boyfriend, acted as Fowler's co-signer.  Fowler was

35

approved with Burgos as her co-signer, despite the fact that Fowler told Richard Brown that Burgos was unemployed. Fowler also testified that she told Brown over the phone that Burgos' only income was a $500 per month stipend from Social Security. Burgos had not worked in years and lived off her Social Security income. The application, however, falsely indicated that Burgos was employed by Hartford Hospital as a nurse's aid earning $1,900 per month.

After credit approval was achieved over the phone, Fowler and Burgos arrived at Shoreline to take delivery of her vehicle. As in many other cases, the process of signing the closing documents was fast and furious. Fowler did not recall seeing that Burgos was listed on the credit application as a nurse's aid employed by Hartford Hospital. Burgos does not read or speak English well, and she received no translation assistance at the closing. She merely arrived at the dealership and signed every document presented to her. According to these witnesses, the balloon payment was never mentioned.

Considering the evidence presented to the jury regarding Counts Seventeen and Eighteen, this Court finds that the jury's verdict was reasonable. Richard Brown's arguments for a judgment of acquittal are unconvincing and his motion is hereby denied.

### 4.    Nelson Datil

Nelson Datil was found guilty of the substantive wire and

mail fraud charges found in Counts Nine, Fourteen, Nineteen,
Twenty, and Twenty-two of the Indictment.  He challenges the
jury's verdict on each of those counts arguing that the evidence
was insufficient as a matter of law and no reasonable jury could
find the elements of the charged offenses were proven beyond a
reasonable doubt.  Specifically, Datil claims that the government
failed to produce direct evidence that Datil personally
Daybreaked false credit applications.

### a.    Count Nine - Mary Jane Best

Ms. Best identified Nelson Datil in court as the salesman
who helped her purchase her vehicle from Shoreline.  She told
Datil while she was providing credit information that she was
unemployed.  Her only source of income was a death benefit she
was collecting in the amount of $2,000 per month following the
loss of her husband.  Her credit application falsely indicates
that she was receiving $3,200 per month in addition to the death
benefit, but she does not know how that information wound up on
her credit application.  She never agreed to pay extra for a CD
changer or a spoiler, but ultimately did so unknowingly.  Datil
told Ms. Best that she was required to purchase an additional
"life insurance" policy because she was buying a new car, but, in
fact, she was under no obligation to purchase life insurance.
While Ms. Best's purchase agreement contained a balloon payment
clause, she testified that no one explained this to her at any

time prior to the police investigation that lead to this trial.
Even though the final paperwork disclosed many of the details
about which Ms. Best testified she was unaware, she also stated
that these details were never discussed orally and she was rushed
through the closing.

### b.    Count Fourteen - Lisa Eng

Ms. Eng was able to identify Datil in court during the
trial.  She completed a credit application personally, supplying
Datil with accurate information about her income and rental
expenses.  Later, Ms. Eng signed a typed version of her credit
application which she did not create.  The handwritten
application listed Ms. Eng's rent as $535 per month, while the
typed version, which was sent to MMCA, listed her rent as $235
per month.

The car that Ms. Eng purchased had an MSRP of $21,000, and
she supplied a deposit in the amount of $8,000.  Ms. Eng
expressly rejected an offer by Datil to sell her an extended
service contract, but, nonetheless, it was included in the final
paperwork and resulted in an additional $900 financed.  Ms. Eng
was never told about the final balloon payment and she noted at
trial that the information regarding this balloon payment was
written in a different color ink than the rest of the paperwork,
including her signature.  The amount of the required balloon
payment was $9,357.66.  Again, many of these details were

38

contained in the final paperwork, but Ms. Eng testified that she relied on the word of Datil and was hurried through the final process of signing the paperwork.

### c.    Count Nineteen - Bienvenido and Carmen Montalvo

Mr. and Mrs. Montalvo wanted to assist their son, Edgar, in the purchase of a new vehicle.  Edgar had recently been released from prison and needed help securing a loan.  Mr. and Mrs. Montalvo each possess a limited grasp of the English language; however Datil speaks Spanish and English.  Mrs. Montalvo co-signed the loan and Mr. Montalvo signed as the primary borrower. Mrs. Montalvo was not working and had not worked since suffering from an aneurysm in 1995.  After learning that Mrs. Montalvo was no longer employed, Datil asked for the name of her most recent employer.  She told him it was a company called Futeramic.  The credit application sent to MMCA lists Mrs. Montalvo as being employed at the time of application by a company called "Duteramic."  Mrs. Montalvo's sole source of income amounted to roughly $540 per month from Social Security though her credit application lists her salary as $2,800 per month.

The Montalvo's also testified that they were never informed of their balloon payment, in the amount of $6,470, or that an extended service contract was included in their purchase.  While this information was included in the final paperwork, Mr. Montalvo testified that he was relying on Datil for guidance and

39

was asked to sign the final documents quickly.

### d.    Count Twenty - Juanita Binns

Ms. Binns bought her car from Shoreline in April 2002 and Datil was her salesman.  Like many of Shoreline's customers, she was attracted to the dealership by a radio advertisement appealing to people with bad credit or no credit at all.  When Ms. Binns purchased her car, she was making $11.55 per hour and working roughly 20 hours per week.  Ms. Binns testified that she truthfully disclosed her income on her credit application, but it was later changed on the version sent to MMCA to indicate she was receiving a salary of $1,655.00 per month.  She stated that she does not know how that figure was changed, and that, if she knew the paperwork included this false information, she would not have signed it.  Ms. Binns also testified that she would not have accepted the deal if she knew about the balloon payment required in the amount of $7,300.  As with the other customers, Ms. Binns found herself signing paperwork late in the day in a hurried atmosphere.  She was told she did not need to read the documents, but rather needed only to sign in certain highlighted areas.

### e.    Count Twenty-two - Royce Sullivan

Mr. Sullivan arrived at Shoreline on a weekend while his wife was out of town.  He was greeted by Nelson Datil at the dealership.  Mr. Sullivan's original intent was to research family cars; however he was enticed by Datil to test drive a

sports car.  Sullivan and his wife had children and were in need
of a second car.  Sullivan included his wife's and mother's
financial information on the credit application in order to
obtain approval.  At the time, Sullivan was working in New Haven
for Empower, a company in business to assist the unemployed in
their search for employment.  Sullivan was reluctant to commit,
so Datil convinced him to take the car for the weekend.  Upon
Mrs. Sullivan's return home, she became "livid" when she realized
her husband brought a sports car home.  The car was not practical
or affordable.  Royce agreed to return the car on the following
Monday.  En route to the dealership, Royce received notice that
he was going to lose his job in the very near future.

Royce returned to the dealership and explained to Datil that
he could not take the car because he could not afford it, he was
on the verge of unemployment, and his wife was very upset with
him.  Datil summoned a Shoreline manager – Bruce Vetre – who,
shortly thereafter, involved the defendant Angel Hernandez in the
conversation.  Hernandez explained to Royce that, since Royce had
taken the car for the weekend, he owed the dealership $500.  The
only way Royce could avoid paying the $500 was if he agreed to
purchase the car.  If Royce chose the latter option, Shoreline
would allow Royce to defer payment for several months.  Facing
the dilemma of owing $500 immediately, which Royce testified he
could not pay, or owing more than $25,000 over approximately five

41

years, Royce regrettably chose the latter.  This, he testified, led in large part to his wife's decision to file for divorce.

Royce's final paperwork, which was sent to MMCA, indicates that he was making $37,000 per year at the time he signed, despite the fact that he told Datil he had lost his job.  Royce owned the car for about two years and never made a single payment before it was repossessed.

As with the other defendants convicted of the substantive offense of mail or wire fraud, the jury saw enough evidence regarding Datil's involvement in the scheme and with each related transaction to conclude that he was aware of the scheme to defraud MMCA and that he actively participated in it in order to reap the financial rewards associated with the sale of a vehicle to each of his customers.  Further, Datil admitted to Detective Potter that he was aware that information relating to his customers was falsified by coconspirators at Shoreline.  The defendant has not provided a basis upon which this Court may substitute its judgment for that of the jury.  Datil's Rule 29 motion for a judgment of acquittal is hereby denied.

## VI.  __Rule 33 Motions__

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A jury's guilty verdict may stand, even in some circumstances involving perjured testimony,

where there is sufficient untainted evidence supporting the
guilty verdict.  See United States v. Sanchez, 969 F.2d 1409 (2d
Cir. 1992).  "It long has been [the Second Circuit's] rule that
trial courts must defer to the jury's resolution of the weight of
the evidence and the credibility of the witnesses." United States
v. LeRoy, 687 F.2d 610, 616 (2d Cir. 1982), cert. denied, 459
U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).  "It is only
where exceptional circumstances can be demonstrated that the
trial judge may intrude upon the jury function of credibility
assessment."  Sanchez, 969 F.2d at 1414.  "Where testimony is
patently incredible or defies physical realities, it may be
rejected by the court, despite the jury's evaluation."  Id.
(Internal citations omitted.)  "All the facts and circumstances
must be taken into account.  An objective evaluation is required
[and there] must be a real concern that an innocent person may
have been convicted."  Id.

  A.   The Government's Closing Remarks Do Not Warrant A New
       Trial

     Angel Hernandez and Nelson Datil both seek a new trial based
on a portion of the government's closing remarks that they claim
was improper.  The contested remarks by the government focused
the jury's attention on the fact that Datil had not presented
rebuttal testimony to refute the government's assertion that

certain relevant documents contained Datil's handwriting.[2]  The
prosecutor's remarks were made during the government's rebuttal
and were a response to Datil's counsel's argument that none of
the witnesses testified that he or she saw Datil write on the
credit applications at issue.[3]  The government contends that its
remarks during rebuttal were meant to counter Datil's counsel's
assertion that a witness needed to be offered who actually saw
Datil write the application.

Hernandez and Datil argue that this was an impermissible
burden shift by the government that resulted in a deprivation of
the Defendant's Fifth Amendment rights.  After hearing the
government's closing remarks, this Court provided curative
instructions to the jury both orally,[4] the very next day, and
written, in the jury charge.[5]  Hernandez argues that the

---

[2] "Now you saw the documents that Mr. Biran put in front of you that
show that it appears as Mr. Datil's handwriting.  And Mr. Einhorn [Datil's
attorney] did not deny that it was his handwriting; he simply said that Maria
Ramos didn't say she saw it, or the Melissa Bailey didn't say she saw him
write it."  Gov.'s Rebuttal, Tr., Vol. 14, p. 247.

[3] Datil's counsel argued, "[i]f Nelson put that $3,000 figure on
himself, why didn't Melissa say 'I saw him do it?  Nelson did it."  Counsel
further asserted that "nobody knows who did that there.  And it's unfair to
assume under those circumstances that it must be Nelson, particularly since
Melissa who was there doesn't say it was Nelson."  Tr., Vol. 14, p. 184.

[4] "Ladies and gentlemen of the jury, as you heard in my initial remarks
to you and as you will again hear in my charge to you, during the course of my
charge, I will remind you that in a criminal case, the Defendant has no burden
to produce or to explain away any evidence.  To the extent that the argument
of government counsel called upon any defendant to explain away any evidence,
such argument was improper, illegal, and should be ignored by you."  Tr., Vol.
16, p. 12.

[5] "Each defendant has pled not guilty to [the] indictment.  As a result
of the defendant's plea of not guilty, the burden is on the prosecution to
prove his guilt beyond a reasonable doubt.  This burden never shifts to a

prosecutor's remarks regarding Datil's failure to rebut the
allegation that he had written some of the purchase documents has
a spill-over effect on all the defendants.

"[A] prosecutor's statements during summation, if improper,
will result in a denial of the defendant's due process rights if
the statements cause substantial prejudice to the defendant."
United States v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989).
"The determination of whether there was such prejudice depends
largely on an analysis of the severity of the misconduct, the
curative measures taken by the court, and the certainty of
conviction absent the misconduct." United States v. Rivera, 22
F.3d 430, 437 (2d Cir. 1994). The curative measures taken by the
Court and outlined in the footnote above were sufficient to
repair any damage to the Fifth Amendment rights of the defendants
that may have been sustained. The jury was instructed on the law
and the rights of each defendant. Specifically, the jury was
told twice that the defendants were under no obligation to
present any evidence, testimonial or documentary, and that any
implication or express assertion by the government that a
defendant was under such an obligation is incorrect and should be
disregarded.

Moreover, the volume of additional evidence offered by the

_____

defendant for the simple reason that the law never imposes upon a defendant in
a criminal case the burden or duty of calling any witnesses or producing any
evidence."  Jury Inst. at 7.

government and referenced extensively throughout this opinion sufficiently persuades this Court that the jury would have reached the same result absent the claimed misconduct.

The motion for a new trial based on the prosecutor's remarks during the rebuttal portion of the government's closing arguments is denied.  All things considered, the government's remarks, though inadvisable, were not so severe as to have prejudiced these defendants.

B.    Evidence of MMCA's Financial Losses Properly Admitted

Angel Hernandez argues that a new trial should be awarded because the Court inappropriately allowed evidence to be admitted regarding the financial losses sustained by MMCA as a result of the fraudulent scheme perpetrated at Shoreline Mitsubishi. Hernandez argues that this evidence was not relevant to any issues that were to be determined at trial and that it was highly prejudicial.

The evidence of MMCA's financial losses was relevant because it established that the borrowers were not qualified for the loans received and was offered to establish the defendants' collective intent to deceive MMCA.  The government's theory was that the defendants understood that the customers they dealt with were not qualified for the loans they needed, and therefore the customers' financial information needed to be falsely adjusted in order to secure approval by MMCA.  With the defendant's

understanding that MMCA would reject Shoreline's customers if truthful information was submitted, the government alleged that the defendants knew that MMCA would be at a greater risk of financial loss if it approved loans based on false information. The loss that was ultimately sustained by MMCA was, therefore, allegedly predictable by the defendants because they were aware that the financial stability of their customers was misrepresented.

Finally, Defendant's claims do not qualify as "exceptional circumstances" wherein the grant of a new trial is appropriate. Sanchez, 969 F.2d at 1414. The motion for a new trial based on the Court's admission of evidence regarding MMCA's financial losses is denied.

C.    Extrinsic Impeachment Evidence Properly Excluded

David Brown claims that a new trial should be granted because this Court excluded extrinsic evidence regarding the disposal of Vetre's Lexus. David Brown argues that he intended to introduce extrinsic evidence in the form of testimony by a former Shoreline employee that Vetre asked coworkers for the name of a person who would steal his Lexus so that Vetre could avoid his remaining payments and collect insurance benefits. This Court granted the government's motion in limine to exclude this extrinsic testimony.

This Court remains satisfied that such testimony is

47

prohibited by Rule 608(b) of the Federal Rules of Evidence.  Rule 608(b) provides: "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence."  Rule 608 permits the defense to cross-examine the witness, in the discretion of the court, regarding certain specific instances of conduct. David Brown's counsel was permitted to cross-examine the witness and Vetre denied making the statement.

Rule 608 is quite clear and the defendant has not offered any legitimate reason why the evidence he proposed to introduce deserves a dispensation.  Therefore, the motion for a new trial based on this Court's exclusion of the aforementioned extrinsic evidence is denied.

CONCLUSION

_____The Court finds that there was sufficient evidence at trial to support the jury's verdict on each count and a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is not appropriate.  Further, because Defendants have failed to prove that the jury reached an erroneous result, or to show any miscarriage of justice in their trial, this Court declines to exercise its authority to grant a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  Accordingly, Defendants' oral and written Motions For a Judgment of Acquittal or a New Trial [Doc. Nos. 543, 573 and 589] are DENIED.

SO ORDERED

_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this _____ day of March, 2006.

49